STEEL CONSTRUCTORS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Steel Constructors, Inc. v. Commissioner
Docket No. 684-76.
United States Tax Court
T.C. Memo 1978-489; 1978 Tax Ct. Memo LEXIS 25; 37 T.C.M. (CCH) 1851; T.C.M. (RIA) 78489; December 11, 1978, Filed Harry A. Morris,Thomas E. King, and Gregory M. Kratofil, for the petitioners. Joe K. Gordon, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined deficiencies in petitioner's Federal income tax for the taxable years 1971 and 1972, in the respective amounts of $ 38,631.86 and $ 47,281.90. Concessions having been made, the sole remaining issue for our decision is whether the bonus paid by Steel Constructors, Inc., to its president and majority stockholder, Robert Hawes, was reasonable to the extent that it exceeded $ 28,976.52 for each of the years 1971 and 1972, and for purposes of *26 the compensation deduction allowed under section 162(a)(1). [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. Steel Constructors, Inc. (petitioner), is a corporation organized under the laws of Missouri. At the time the petition was filed herein, petitioner's principal office and place of business was at Grandview, Missouri.Petitioner filed its Federal income tax returns for the calendar years in issue with the Internal Revenue Service Center, Kansas City, Missouri. Petitioner was formed in 1957 to operate the Havens Steel Company's *27 steel erection department as a separate business. The shareholders of petitioner were Fred Havens, Harriet Havens, Ellsworth Filby, and Hans von Unwerth, owning 25, 25, 50, and 50 shares of stock, respectively. In an effort to diversify petitioner's structural steel business, Robert Hawes (Hawes) was hired in 1960. His area of expertise was in window-wall erection so that petitioner immediately placed him in charge of its window-wall division. Throughout his employment, Hawes negotiated a variety of compensation packages. In one instance Hawes and petitioner entered into an incentive compensation arrangement whereby Hawes would receive 25 percent of the profits from the window-wall division and an incremental 25 percent of the residual profits as a bonus. Pursuant to this agreement, Hawes received bonuses from 1963 to 1969. During 1969 a new compensation arrangement was entered into between Hawes and petitioner. At the time of this agreement Hawes served in the capacity of an employee-supervisor and owned no stock in petitioner. The agreement, which was written by Hawes, stated: It is agreed between Bob Hawes and Steel Constructors Inc. that if Bob Hawes purchases 60 *28 percent of Steel Constructors Inc. after S.C.I. purchases Hans von Unwerth and Pete Filby's stock he will have complete control of said corporation. It is agreed that his salary will be $ 350.00 per week plus 50 percent of all profits and his salary will be increased at the same percent that the Iron Workers Local #10 contracts increase their pay. It is agreed that Fred Havens' salary will only be $ 460.00 per month. If Fred Havens contributes more time in the future his salary will be increased by a mutual agreement. It is agreed that the corporation will start paying the men in the field a bonus on the profits. The amount of each man's bonus will be determined by Bob Hawes. The bonus will range from 10 percent to 25 percent of profit before taxes and will not be as originally set up by the corporation. The men's bonus will be paid before Bob Hawes gets his 50 percent of profits. It is agreed Bob Hawes will have complete control as to everyones salary.
It is agreed that if Fred Havens or Bob Hawes is dissatisfied with how the corporation is progressing the dissatisfied party will sell their shares of stock to the other party at book value at the end of the last complete *29 year ending 12/31.
On April 1, 1970, petitioner redeemed the capital stock owned by Filby and von Unwerth. A note was given to von Unwerth in the amount of $ 58,170, to be paid in monthly installments of $ 1,700 per month, with an annual percentage rate of eight percent on the unpaid balance. Similarly, Filby was also given a promissory note for his stock, in the same amount and with the same terms and conditions as the von Unwerth note. On December 31, 1965, Harriet Havens had transferred all of her shares to Fred Havens; consequently, he was petitioner's sole shareholder after these redemptions. Fred Havens, on April 14, 1970, sold 30 shares of petitioner's stock to Hawes. This sale resulted in Hawes owning 60 percent and Havens owning 40 percent of the outstanding capital stock of petitioner. Therefore, since Hawes was elected president on April 1, 1970, he was president and majority shareholder during the years in issue. Following his election as president, Hawes became responsible for petitioner's entire business operations. These operations were cyclical in nature, causing a fluctuation in sales based upon the demand for reinforcing steel. Petitioner is essentially *30 a subcontractor operating in the competitive industry of steel reinforcement. During the years in issue, petitioner had approximately six subcontractors and an even greater number of general contractors in direct competition with it. In response to this, Hawes developed a new corporate strategy evidenced by his functional reorganization of petitioner. [2] Under a new process development petitioner developed a steel reinforcing process called "post tensioning," which placed it in the vanguard of steel reinforcement techniques in its geographic area. An additional innovative strategy was to make petitioner more capital intensive and less labor intensive through the employment of construction equipment. The measure of economic success directly attributable to these strategies is evident from petitioner's taxable income, since it increased from $ 1,770.34 in 1970, to $ 95,544 in 1972. Most of the managerial *31 functions associated with petitioner's business were performed by Hawes. He made all the major corporate decisions. Furthermore, the nature and extent of his corporate duties varied in that his position entailed contacting customers, performing job estimates, and submitting job bids. He also negotiated, drafted, and executed construction contracts on behalf of petitioner. The supervision of production personnel in the field, which required auditing by Hawes of both the quality and the quantity of their work at the jobsite, was a further responsibility. In 1971, Hawes had one superintendent, one general foreman, seven foremen, and thirteen part-time foremen under his supervision. In 1972, he had one super-intendent, two general foremen, seven foremen, and nine part-time foremen under his supervision. It is clear from the record that Hawes devoted most of his waking hours to petitioner's business. During the years in issue, Hawes worked an average 16-hour day, from 5 a.m. to 9 p.m. A major portion of his time and energy was devoted to coordinating and supervising as many as 15 different construction projects on a given day.After Hawes received information from the foremen on *32 the existing jobs and from the superintendents for the general contractors, he would organize the job information to determine which jobs and what personnel would be necessary for the day. He would then contact specific individuals before 8 a.m. to inform them of the job's location and proceed to the jobsites to remedy any problems. The remainder of his day would be spent analyzing architectural plans for proposed construction projects and planning job production for the next day. Hawes received the following annual compensation, comprised of salary and bonus, for his services on behalf of petitioner: Year
Salary
Bonus
Total
1960
$ 7,385.00
$ 0 $ 7,385.00
1961
8,240.00
2,755.50
10,995.50
1962
9,555.00
0
9,555.00
1963
10,385.00
17,597.84
27,982.84
1964
10,400.00
26,204.75
36,604.75
1965
11,620.00
36,348.98
47,968.98
1966
11,700.00
36,286.74
47,986.74
1967
13,000.00
21,042.25
34,042.25
1968
14,275.00
28,791.37
43,066.37
1969
15,235.00
23,721.99
38,956.99
1970
18,930.00
0
18,930.00
1971
25,038.00
88,632.12
113,670.12
1972
26,868.75
94,289.25
121,158.00
The average compensation paid Hawes from 1960 through *33 1970 amounted to $ 29,406.77 and during the taxable years in issue was $ 117,414.06. The ratio of bonus compensation paid to gross income for the years 1971 and 1972 is 32.18 and 35.51 percent, respectively. It is a common practice in the construction industry to pay top executives a bonus based upon a percentage of the profits. Petitioner had gross income, taxable income, and retained earnings for the taxable years 1964 through 1972 as follows: Year
Gross Income
Taxable Income
Retained Earnings
1964
$ 207,826.57
$ 35,358.50
$ 51,775.35
1965
264,252.21
40,290.20
82,391.67
1966
347,237.68
34,652.67
107,088.91
1967
410,844.40
51,978.47
141,035.75
1968
367,888.64
26,485.35
160,939.21
1969
525,768.13
6,120.46
165,520.84
1970
281,293.06
1,770.34
150,844.73
1971
275,432.00
67,776.00
201,244.00
1972
265,508.00
95,544.00
273,145.00
Since its incorporation, petitioner has never paid a dividend. At the trial a variety of reasons were offered to explain this lack of a dividend yield. One reason given was the pending litigation that arose from a major construction accident. The extent of petitioner's potential liability in *34 these lawsuits was in excess of $ 2,000,000. In addition, the liquidity necessary to pay dividends was lacking as evidenced by the difficulty that petitioner had in meeting its payroll. Petitioner also had the obligation to make principal payments of $ 1,700 per month each (plus decreasing amounts of interest) to two former shareholders for their stock. In the statutory notice of deficiency respondent determined that an annual bonus to Hawes of $ 28,976.52 for taxable years 1971 and 1972, respectively, was reasonable, and disallowed the remaining deductions of $ 59,655.60 in 1971, and $ 65,312.73 in 1972, as excess compensation paid to petitioner's president and majority stockholder. OPINION Respondent asserts that for the years in issue, reasonable compensation (salary plus bonus) to petitioner's chief executive officer and majority stockholder, Hawes, is $ 54,014.52 for 1971, and $ 55,845.27 for 1972, and that only these amounts are deductible in computing petitioner's taxable income pursuant to section 162(a)(1).
The question of reasonable compensation is one of fact to be determined *35 from all the fcts and circumstances of the case. Charles Schneider & Co. v. Commissioner,500 F. 2d 148 (8th Cir. 1974), affg. a Memorandum Opinion of this Court; Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. 564 (1974), affd. 528 F. 2d 176 (10th Cir. 1975). The burden of proving reasonableness of the compensation paid rests squarely with petitioner. Rule 142(a), Tax Court Rules of Practice and Procedure; Botany Mills v. United States,278 U.S. 282 (1929). In addition, this Court will closely scrutinize any case where the controlling shareholder can establish his own compensation from the corporation to determine whether such compensation is, in substance, a distribution of corporate earnings and profits in the guise of salaries. Heil Beauty Supplies v. Commissioner,199 F. 2d 193 (8th Cir. 1952), affg. a Memorandum Opinion of this Court; Levenson & Klein, Inc. v. Commissioner,67 T.C. 694 (1977). A variety of factors should be considered in cases of this type with *36 no one factor conclusive. In Mayson Mfg. Co. v. Commissioner,178 F. 2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court, the Sixth Circuit identified these factors, to wit: Although every case of this kind must stand upon its own facts and circumstances, it is well settled that several basic factors should be considered by the Court in reaching its decision in any particular case. Such factors include the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * The situation must be considered as a whole with no single factor decisive. The compensation paid Hawes consisted of a fixed salary plus a bonus contingent *37 upon a predetermined formula under the 1969 compensation agreement executed between Hawes and petitioner. Respondent argues that the amount of contingent compensation in excess of $ 28,976.52 for taxable years 1971 and 1972 is, in effect, a de facto dividend. We disagree. After viewing the entire record, we believe that the parties to the compensation agreement intended the bonus payments to be, and that they were, compensation and not a mechanism for the distribution of earnings and profits without relation to the services performed. As the testimony indicated, Hawes was the sine qua non of petitioner's success. The petitioner was clearly not in a financial position to pay dividends, given the potential liability under the pending lawsuits, the payments to the former shareholders for their stock, and the liquidity problems occasioned by the cyclical nature of petitioner's business. We also recognize that petitioner's bonus arrangement was established prior to the years in question and before Hawes was a stockholder of petitioner. This militates against the finding of a de facto dividend. Streckfus Steamers, Inc. v. Commissioner,19 T.C. 1, 7 (1952). Respondent *38 also challenges the compensation agreement on the grounds that the compensation had not been fixed pursuant to a "free bargain." See, e.g., Pepsi-Cola Bottling Co. of Salina, Inc.,61 T.C. at 569. The regulations indicate that the proper inquiry into the circumstances surrounding the reasonableness of compensation under an employment contract is determined at the date when such contract is made, not at the date when it is questioned. As stated in section 1.162-7(b)(2) and (3), Income Tax Regs., in relevant part: (2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the *39 part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. (3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned. [Emphasis supplied.] A crucial question in the instant case is whether the contingent compensation agreement was executed in 1969 pursuant to a free bargain uninfluenced by any consideration other than securing on fair and advantageous terms the services of Hawes. In general, it is well recognized that a bonus system based on *40 profits is a permissible compensation device in modern industry. William S. Gray & Co. v. United States,35 F. 2d 968, 974 (Ct. Cl. 1925). We note that it is customary in the construction business to compensate officers and other key employees by paying them a fixed salary in conjunction with a bonus based on the profits of the business.
A bonus type contract which is reasonable with a non-stockholder employee may be unreasonable if made with a large stockholder, since the incentive of the bonus would presumably not be needed to call forth the stockholder's best efforts. Charles Schneider & Co. v. Commissioner,500 F. 2d 148, 153 (8th Cir. 1974), affg. a Memorandum Opinion of this Court. On the other hand, the reasonableness of the compensation paid to a stockholder-officer who renders valuable services should not be invalid per se simply because the officer is also a shareholder and could have taken a portion of the amount paid him in the form of dividends.[3]
*41 We have found that at the time the contract was executed Hawes was an employee of petitioner. Respondent's argument that the compensation portion of the contract agreement was not freely bargained for between the parties is not corroborated by the facts. While admittedly not the product of a lawyer's pen, the contract hereunder establishes a method of compensation for Hawes and several other employees. An element reflecting on the intent of the parties as to the effect of this agreement is the fact that it did not require Hawes to repay petitioner amounts received under the agreement but which were later declared to be unreasonable. Such a provision could reflect a pre-existing knowledge by petitioner that the payments would not be reasonable for tax purposes and could lead to an inference as to their intent. Charles Schneider & Co., Inc. v. Commissioner,supra at 155.
Respondent further contends that the compensation paid to Hawes during the years in issue is not reasonable in view of his job performance for petitioner. We do not agree.The record makes it clear that Hawes was primarily responsible for petitioner's success. He is well qualified to manage *42 petitioner's business based upon his skills and abilities developed through years of business experience as an iron worker, foreman, and division manager. It is equally clear from the record that Hawes worked extremely long hours and that he had few, if any, outside interests. Thus, the compensation paid Hawes was not a result of fortuitous economic conditions but was attributable to the business acumen and ability of Hawes. See Geiger & Peters, Inc. v. Commissioner,27 T.C. 911, 921 (1957). We note that the minority shareholder, Fred Havens, expressly approved of the bonus compensation paid Hawes during the years in issue as the following testimony so indicates: Q Well, Mr. Havens, if Bob Hawes hadn't bought the 60%, if you still owned 100% would you have given him 50% of the profit? A Instead of being a stockholder, he'd been an employee, he would -- in my opinion, would still be given the same remuneration. I feel that the 50% is -- for the work that he does, it certainly is not out of line. Q What work does he do that justifies 50% of the profits? A Well, I think it's good to understand that Bob Hawes is -- is running this business basically by *43 himself and that if we, being a bigger company, were to do the job, we would probably have three people in this one position. * * * Petitioner has failed to introduce any evidence relating to the amounts which would ordinarily be paid for like services by like enterprises under like circumstances. Mayson Mfg. Co. v. Commissioner,178 F. 2d 115, 119 (6th Cir. 1949). However, the president of a competitor to petitioner testified that no similar enterprise existed. More importantly, failure to prove this element is not fatal to petitioner's case for it is only one of several elements. See Faucette Co. v. Commissioner,17 T.C. 187, 196 (1951). One of the factors we must consider in the case of small corporations with few officers is the amount of compensation paid to a particular officer in previous years. Mayson Mfg. Co. v. Commissioner,supra at 119. Hawes received an average annual compensation of $ 29,406.77 for the 11 years immediately preceding the years in issue. Prior to becoming petitioner's chief executive officer, the *44 lower annual compensation reflected that Hawes, over this span of time, had assumed no corporate duties for the other corporate divisions, had planned no corporate strategies, and had decided no corporate policies. During the years in issue, Hawes became personally involved in all these activities which explains, in conjunction with the cyclical nature of petitioner's business, why his average annual compensation increased to $ 117,414.06.At the trial numerous witnesses corroborated Hawes' testimony that his increased responsibilities justified the salary paid him. In addition, this witness's demeanor cannot be wholly discounted. The intelligence, candor, and veracity which Hawes exhibited at the trial further supports a finding that he is the instrument of petitioner's success. For all of the above reasons, we find that the compensation paid to Hawes during the years in issue is not unreasonable in light of his outstanding job performance rendered petitioner. Accordingly, we hold from the entire record that the compensation paid to Hawes during the years in issue was reasonable in amount and fully deductible. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954. The parties stipulated that the bonus compensation paid to Fred Havens, as vice president and minority stockholder of petitioner, during taxable year 1972 was allowable. In addition, in his reply brief respondent conceded that the Economic Stabilization Act of 1970 was not violated by either the bonus payments to Robert Hawes or the bonus payments to petitioner's foremen during the taxable years in issue. See Medical Collection Corp.,T.C. Memo. 1977-266. Rev. Rul. 72-236, 1972-1 C.B. 41↩.
2. The record indicates that Hawes' Reinforcing (window-wall) Division contributed 78.50 percent toward petitioner's total profits.By eliminating the Steel Erection Division this enabled petitioner to concentrate its entire resources in the Reinforcing (window-wall) Division.↩
3. See, e.g., Fotocrafters Inc. v. Commissioner,T.C. Memo. 1960-254↩.