MUSKOGEE RADIOLOGICAL GROUP, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
MUSKOGEE RADIOLOGICAL GROUP v. COMMISSIONER
Docket Nos. 2082-77, 9253-77.
United States Tax Court
T.C. Memo 1978-490; 1978 Tax Ct. Memo LEXIS 26; 37 T.C.M. (CCH) 1851-6; December 11, 1978, Filed Ray K. Babb, Jr., for the petitioner. James D. Thomas and Patrick E. McGinnis, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: In these consolidated cases the respondent determined the following deficiencies in petitioner's Federal income taxes: Dkt.No.
Year
Deficiency
9253-77
1972
$ 1,336.50
2082-77
1973
5,079.81
9253-77
1974
6,799.59
9253-77
1975
2,778.36
Petitioner has conceded one adjustment to income for 1973. The deficiency determined for 1972 is based upon the disallowance of a claimed net operating loss carryback from the year 1975. The net operating loss for 1975 was eliminated by the adjustments in the notice of deficiency for 1975 which is in issue herein. Consequently, a decision on the adjustments will automatically determine the existence or absence of a deficiency for 1972. At issue is whether certain payments made by petitioner to Dr. John R. Rafter in 1973, 1974, and 1975 are deductible *28 as ordinary and necessary business expenses in the nature of compensation or whether they constitute the cost of acquiring a capital asset. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Muskogee Radiological Group, Inc. (petitioner) was incorporated under the laws of Oklahoma on December 31, 1968. The petitioner's principal place of business was in Muskogee, Oklahoma, when the petitions were filed in these cases. For the taxable years 1972 through 1975 the petitioner filed timely United States Corporation Income Tax Returns (Forms 1120) with the Internal Revenue Service Center, Austin, Texas. John R. Rafter is a medical doctor who specializes in radiology. He has been a resident of Muskogee, Oklahoma, for more than 60 years. He was licensed to practice medicind in Oklahoma in 1938. From 1954 through 1967 Dr. Rafter was a radiologist in Muskogee practicing by himself. Prior to January 1, 1968, he was the only radiologist at the Muskogee General Hospital and served as head of its Department of Radiology. On occasion he employed part-time medical residents to assist him. In 1964 or 1965 Dr. Rafter employed Dr. George Ladd and Dr. Gary Evans *29 to work for him on a part-time basis for four or five weeks. Beginning in January 1968, Drs. Rafter and Ladd practiced radiology as a partnership until December 31, 1968, when the petitioner was organized and incorporated with an original issue of 3,600 shares of common stock. On January 3, 1969, Drs. Rafter and Ladd were each issued 1,800 shares of stock in the petitioner corporation. Dr. Rafter was then 55 years of age and Dr. Ladd was 31 years old. On April 2, 1970, Dr. Evans joined the practice of radiology with Drs. Rafter and Ladd by purchasing a total of 1,200 shares of common stock of petitioner. He purchased 600 shares from Dr. Rafter and 600 from Dr. Ladd. At that time Dr. Evans was 31 years of age. He was brought into the radiology practice because he had specialized training in arteriography and nuclear medicine. Dr. Ladd was also skilled in these procedures, but Dr. Rafter was not. Sometime in November 1972 Dr. Rafter was informed by Drs. Ladd and Evans that they no longer desired to be associated with him in practicing radiology and that they would either buy him out or he could buy them out. Dr. Rafter realized that, if there was going to be a separation *30 from Drs. Ladd and Evans, he would have to sell his interest in the petitioner corporation because he was unable to buy their interests. Thomas Wilson, an attorney, represented the petitioner in the negotiations pertaining to the disassociation of Dr. Rafter from the practice of radiology with Drs. Ladd and Evans and the termination of his interest in petitioner. Dr. Rafter was represented by his attorney, Al Matthews. In late January 1973, Dr. Rafter and his attorney and Drs. Ladd and Evans, represented by petitioner's counsel, Mr. Wilson, held the annual meeting of petitioner's directors to discuss further the termination of Dr. Rafter's interest in petitioner. At that meeting Dr. Rafter proposed to resign if he was paid the book value of his stock plus $100,000. Drs. Ladd and Evans agreed to pay Dr. Rafter a total of $131,016 which consisted of $31,016 set as the book value of his stock plus $100,000. The drafting of a fromal agreement was left to the attorneys. In February 1973 there was executed by Dr. Rafter, as president, and Dr. Ladd, as secretary, a document entitled "Minutes of the Meeting of the Directors of Muskogee Radiological Group, Inc." dated December 7, 1972, which *31 reads, in part, as follows: Dr. George H. Ladd stated that he believed that the corporation should establish a plan whereby a doctor employee who worked for the corporation until age 60 and retired, should be compensated for his past services to the corporation. There was a general discussion following said remarks by Dr. Ladd and upon motion duly made, seconded and unanimously approved, the following deferred compensation plan was adopted. A doctor employee of the corporation who has reached age 60 and then retires from active employment by the corporation shall be entitled to receive and shall receive deferred compensation upon the following terms and conditions. A. The corporation shall pay $10,000.00 to the retired doctor for each year or part of a year that the retired doctor has been employed by the corporation up to a maximum of five (5) years. B. Should the retired doctor die during said five (5) year period after having retired then the corporation shall pay the balance due to the retired doctor, to the retired doctor's spouse, if living, otherwise to the legal representations of the deceased retired doctor. C. That the payments of $10,000.00 per year shall *32 be paid on a quarterly basis in substantially equal amounts. The first payment shall be paid three (3) months after the effective retirement date and every three (3) months thereafter until the sum due shall have been paid. D. That these payments shall be made on condition that the retired doctor shall not during the said five (5) year period, directly or indirectly, practice radiology in the City of Muskogee, Oklahoma, which would be in competition with the corporation. At the time of the execution of the "Minutes" and the adoption of the deferred compensation plan Dr. Rafter was over 60 years of age. An Agreement dated April 12, 1973, was executed by the parties which provided as follows: THIS AGREEMENT entered into this 12th day of April, 1973, by and between Dr. John R. Rafter of Muskogee, Oklahoma and Muskogee Radiology Group, Inc., a Professional Corporation, of Muskogee, Oklahoma, hereinafter called "Corporation". WHEREAS, there has arisen between Dr. John R. Rafter, who is a shareholder of the corporation, and Dr. George H. Ladd and Dr. Gary G. Evans, also shareholders of the corporation, differences which prevent the continuation of the corporation as a viable *33 business, and, NOW, THEREFORE, the parties have agreed to resolve their differences upon the following terms and conditions to which both parties agree and are hereby bound by, to-wit: 1. That Dr. John R. Rafter tenders his resignation as an employee of the corporation, and the corporation hereby accepts his resignation, effective the 1st day of May, 1973. Dr. John R. Rafter hereby specifically waives the 12th clause of his employment contract with the corporation dated January 1, 1972, wherein it provides for 90 days written notice, and the corporation hereby waives said clause. 2. That Dr. John R. Rafter shall be entitled to ten (10) days of vacation up to and including April 30, 1972. 3. That Dr. John R. Rafter shall sell to the corporation his 1,200 shares of stock in the corporation, and the corporation shall redeem said shares of stock for the sum of $31,016.00, payable as follows: The sum of $8,994.64, upon the execution of this agreement and proper execution of the stock certificate. The balance of $22,021.36 shall be paid in two equal payments of $11,010.68, the first payment to be made on the 1st day of April, 1974, and the second and final payment shall be *34 made on the 1st day of April, 1975. The balance of $22,021.36 shall be evidenced by a promissory note properly executed by the corporation and in favor of Dr. John R. Rafter. The corporation shall also execute a pledge of the stock as collateral for the loan. 4. The corporation shall employ Dr. John R. Rafter as a consultant radiologist for the corporation and Dr. John R. Rafter hereby accepts said employment, upon the following terms and conditions: A. Duties. The corporation hereby retains Dr. John R. Rafter to perform, and Dr. John R. Rafter shall perform, during theperiod, such advisory and consultative services on a part time basis as may, from time to time, be requested by the Board of Directors of the corporation, subject however to the following conditions: (a) Such services shall be performed in Muskogee, Oklahoma as the corporation may from time to time designate. (b) John R. Rafter shall not be required to devote a major part of his time to such services; and (c) John R. Rafter shall not be required to render such services during reasonable vacation periods or during periods of illness or other incapacity, (d) Should Dr. John R. Rafter be employed elsewhere *35 during the term of this agreement, that is not in competition with the corporation, he shall not be required to render services during hours that would conflict with his other employment schedule. B. Conditions to Payments. The corporation shall not be required to make any payments to Dr. John R. Rafter should during the term of this agreement he practices directly or indirectly, radiology in the City of Muskogee, Oklahoma which would be in competition with the corporation. C. Term. This agreement is entered into for a period of five years from the date of this agreement. D. Compensation. The Corporation shall pay to Dr. John R. Rafter the sum of $10,000.00 per year, payable as follows: The sum of $2,500.00 shall be paid on the 1st day of January, the 1st day of April, 1st day of July and the 1st day of October, each year beginning July 1, 1973 and ending April 1, 1978. E. Death. Should Dr. John R. Rafter die during the term of this agreement, the corporation, unless Dr. John R. Rafter has violated any of the provisions of this agreement, shall pay to his wife, if living, or otherwise to his legal representatives, the sum or sums or money then owing *36 under this agreement, as they become due and payable. F. That the corporation shall not be liable, nor shall they be required to furnish any fringe benefits for Dr. John R. Rafter that other full time employees might have or be entitled to. G. Waiver. The waiver by the corporation of a breach of any provision of this agreement by Dr. John R. Rafter shall not operate or be construed as a waiver of any subsequent breach by Dr. John R. Rafter. H. Assignment. The rights and obligations of the corporation under this agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the corporation. I. That Dr. John R. Rafter shall exectute a release of any and all actions, claims and demands he has/have or may hereafter have, except as to the provisions of this Agreement, against Dr. George H. Ladd, Dr. Gary G. Evans, Muskogee Radiology Group, Inc. and Thomas V. Wilson. J. That Dr. John R. Rafter shall be entitled to receive the benefits of the deferred compensation plan established by the corporation on December 7, 1972, and that the sum due to Dr. John R. Rafter under said plan is $50,000.00 payable over a five year period as *37 contained in said deferred compensation plan. This Agreement contains the entire agreement of the parties. It may not be changed orally but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification, extension or discharge is sought. Both Drs. Ladd and Evans were advised by Mr. Wilson, the petitioner's attorney who drafted the Agreement, of the tax savings to petitioner if the $100,000 to be paid to Dr. Rafter in excess of the book value of his stock were characterized as compensation rather than a capital expenditure. Dr. Rafter was represented by his attorney, Mr. Matthews, who had consulted with an accountant regarding the tax consequences of the Agreement. Dr. Rafter read and understood the Agreement when he signed it. He knew it contained provisions for the payment of consulting fees, deferred compensation, and a covenant not to compete. He entered into the Agreement knowingly, voluntarily, and willingly.He treated the items on some of his Federal income tax returns in a manner consistent with the terms of the Agreement.
Dr. Rafter terminated his relationship with petitioner in late April 1973. After that time he *38 was never called upon to perform any services for petitioner. However, he was available to do so and he continued to remain a member of the staff of Muskogee General Hospital. He maintained his medical malpractice insurance for at least a year. In June 1973 Dr. Rafter was employed as a physician (radiologist) by the Veterans Administration, where he presently works. Pursuant to the Agreement of April 12, 1973, petitioner paid Dr. Rafter and deducted on its Federal corporate income tax returns as "consultant fees" the amounts of $5,000 for 1973, $10,000 for 1974 and $10,000 for 1975. Pursuant to the Agreement of April 12, 1973, petitioner paid Dr. Rafter and deducted on its Federal corporate income tax returns as "deferred compensation" the amounts of $7,500 for 1973, $10,000 for 1974, and $10,000 for 1975. In his notices of deficiencies the respondent disallowed the petitioner's claimed deductions for consultant fees and deferred compensation on the ground it had not been shown that the payments were made for those purposes and they did not constitute ordinary and necessary business expenses. ULTIMATE FINDING OF FACT The payments made by petitioner to Dr. Rafter in *39 the amounts of $12,500 for 1973, $20,000 for 1974 and $20,000 for 1975 were intended to compensate him for past or futrre services and therefore constitute ordinary and necessary business expenses deductible by petitioner. OPINION The issue confronting us is basically factual in this situation where the tax consequences to petitioner and Dr. Rafter are antithetical. Petitioner contends that the payments in question were compensation for past and future services, as specified in the Agreement of April 12, 1973. To the contrary, respondent contends that in substance the payments for consulting services and deferred compensation were consideration for the sale of Dr. Rafter's stock in the petitioner corporation. Respondent stresses that no future services were ever rendered by Dr. Rafter, that petitioner was in no way obligated for past services rendered by him, that the Agreement under which the payments were made was drafted in order to characterize them as compensation for the purpose of converting them into deductible expenses, and that the payments were an integral part of the total amount necessary to buy out Dr. Rafter's equity interest in petitioner. Alternatively, it *40 is respondent's position that no part of the payments is allocable to the covenant not to compete since no evidence of the value of such a covenant was introduced by petitioner. We agree with the petitioner. Upon consideration of the Agreement of April 12, 1973, and all the facts and circumstances present in this proceeding, we conclude and have found as an ultimate fact that the payments in question were intended to compensate Dr. Rafter for past and future services and, as such, constitute deductible business expenses. We think the petitioner has sustained its burden of proof by a preponderance of the evidence. We recognize that the substance of a transaction and not merely its form controls the treatment of the payments for Federal income tax purposes. Where, as here, the respondent attacks the form of an agreement, this Court will examine the substance of the transaction so that the operation of the tax laws will not be frustrated by the mere form in which the agreement is drawn. Gregory v. Helvering,293 U.S. 465 (1935); Commissioner v. Court Holding Co.,324 U.S. 331 (1945). *41 Although we are reluctant to change the tax consequences of a bona fide contract entered into through arm's-length bargaining, we are certainly "at liberty to pierce the form of a particular transaction to arrive at the just tax liability." Coca-Cola Company v. Commissioner,369 F.2d 913, 928 (8th Cir. 1966). But in these circumstances we see no justification for piercing the form of the agreement.See Hamlin's Trust v. Commissioner,209 F. 2d 761 (10th Cir. 1954), affg. 19 T.C. 718 (1953), where the Court of Appeals said at page 765: But the effectiveness taxwise of an agreement is not measured by the amount of preliminary discussion had respecting it. It is enough if parties understand the contract and understandingly enter into it. * * * It is reasonably clear that the sellers failed to give consideration to the tax consequences of the provision, but where parties enter into an agreement with a clear understanding of its substance and content, they cannot be heard to say later that they overlooked possible tax consequences. * * * In our judgment the parties here entered into the Agreement of April 12, 1973, knowingly, voluntarily, *42 and willingly. They read the Agreement, they understood it, they knew it contained the provisions for consulting services and deferred compensation and the noncompetition convenant. They signed the Agreement with full knowledge of its legal and tax consequences. In other words, we think the provisions of the Agreement had "some independent basis in fact or some arguable relationship with business reality." Schulz v. Commissioner,294 F. 2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960). Payments made for consulting services rendered constitute ordinary income. Section 61. [1] Likewise, the covenantor realizes ordinary income from payments received for his covenant not to compete. Ullman v. Commissioner,264 F. 2d 305, 307 (2d Cir. 1959), affg. 29 T.C. 129 (1957). Section 162(a)(1) allows a deduction for reasonable expenses if paid or incurred as compensation for personal services, including consulting services. In addition, a purchaser can amortize over the term of the covenant payments made for a noncompetition agreement. *43 Section 167(a)(1); section 1.167(a) - 3, Income Tax Regs.Levinson v. Commissioner,45 T.C. 380, 389 (1966). On the other hand, payments which constitute a gain from the sale of property within the definition of capital asset in section 1221, such as stock, goodwill, or going-concern value, represent capital gain to the party earning the income and nondeductible capital expenditures to the party making the payments. Respondent urges that the stated compensation in the Agreement was unrelated to the value of future services contemplated by the parties, and thus in substance represented disguised payments for Dr. Rafter's stock.It is argued that, in fact, Dr. Rafter performed no services for petitioner. Respondent also refers to the provisions in the Agreement that the payments would continue after Dr. Rafter's death and that he was not obligated to render consulting services during periods when his health would not permit, during vacations, or during regular duty hours of other employment. It is reasonable that Drs. Ladd and Evans considered it necessary *44 to have Dr. Rafter available for consultation purposes. His experience and personal contacts were important. This is true even though, because of the deterioration of the personal relationships between him and Drs. Ladd and Evans, he was never asked for assistance. The nature of the payments depends upon the agreement when entered into, not upon subsequent action or inaction by the parties. Barrett v. Commissioner,58 T.C. 284, 289 (1972); Wager v. Commissioner,52 T.C. 416, 419 (1969). The fact that the Agreement provided that payments were to continue for the 5-year period even if Dr. Rafter should die during such period, is obviously a factor to be considered, but it does not necessarily mean that the agreed payments were not compensation for current and future services. Cf. O'Dell & Co. v. Commissioner,61 T.C. 461, 470 (1974); Wager v. Commissioner,supra;Levinson v. Commissioner,supra at 391 (1966). We think petitioner regarded Dr. Rafter's services, at least in the beginning, sufficiently important that it was willing to commit the corporation to make payments for 5 years even *45 if Dr. Rafter was not available to render services during the entire period. Moreover, the Agreement of April 12, 1973, contained a covenant by Dr. Rafter not to compete with petitioner. While this provision did not have a separately stated consideration, it did represent an additional commitment on Dr. Rafter's part, supplemental to the consulting commitment, and it added value to the consideration for which petitioner was committed in the Agreement to pay annually. In support of his position that the payments in question were capital in nature, respondent further argues that the $131,016 agreed upon represents Dr. Rafter's share of the fair market value of the tangible and intangible assets of petitioner. Since $31,016 is one third of the book value of petitioner's tangible assets, respondent maintains that the increment paid in excess of the book value represents the value of petitioner's intangible assets, namely goodwill, and also represents the premium which Drs. Ladd and Evans were willing to pay in order to acquire for themselves a lucrative medical practice. We reject this contention. It is clear that petitioner's radiologists performed essentially personal services *46 and their business was dependent primarily upon services and other patient-doctor relationships. Dr. Rafter's importance to the business "disproves the existence of transferable goodwill attributable to the business itself." Wilmot Fleming Engineering Co. v. Commissioner,65 T.C. 847, 861 (1976). There is no evidence in this record that petitioner had the kind of earning capacity which is ordinarily associated with recognizable goodwill. See and compare Carty v. Commissioner,38 T.C. 46, 58 (1962). Accordingly, we hold that respondent erred with respect to the disputed issue. The claimed deductions are allowable as ordinary and necessary business expenses. To reflect such conclusion and the concession by petitioner of another issue, Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩