ROBERT and EULA DOWNS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
DOWNS v. COMMISSIONER
Docket No. 5087-77.
United States Tax Court
T.C. Memo 1978-502; 1978 Tax Ct. Memo LEXIS 11; 37 T.C.M. (CCH) 1851-58; December 20, 1978, Filed Gary A. Ward and George D. McDonald, for the petitioners. Frank C. Hider, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency in the amount of $8,805.53 in petitioners' Federal income tax for 1973. The issue for decision is whether petitioners are entitled under section 162(a) [1] to deduct as an ordinary and necessary expense of their cattle feeding business the sum of $27,500 which they paid for 1 million pounds of grain in 1973. FINDINGS OF FACT Petitioners Robert and Eula Downs, husband and wife, *12 were legal residents of Roscoe, Texas, when the petition was filed. They filed their joint Federal income tax return for 1973 with the Director, Internal Revenue Service Center, Austin, Texas. Petitioners use the cash receipts and disbursements method of accounting. During 1971, 1972, and 1973, petitioners were both employed by H & H Feed Lot (hereinafter H & H)--Robert Downs (hereinafter Robert) as a grain buyer and office manager and Eula Downs (hereinafter Eula) as bookkeeper and secretary to the general manager. H & H was engaged in the business of feeding cattle owned by its customers. H & H made its profits through buying ingredients, processing and mixing them, feeding the mixture to its customers' cattle, and adding to the cost of the feed a markup sufficient to provide a profit. Generally speaking, the charge for the feed was at retail rates. During and before 1973, H & H maintained a cash prepayment feed program under which a customer-feeder advanced funds to H & H and received a credit to his account to cover the cost of feeding his cattle during a feeding cycle. The customer's credit was applied to his account, and he was charged the retail rate for feed every *13 15 days. If this credit was not used up by the feed charges, it was subject to refund upon request, to being carried over to the next feeding cycle, or to being fed to other pens of cattle belonging to the customer. The cash prepayment was limited to an amount computed by projecting the cost of feed for cattle on hand at H & H at the time of payment. For periods in which H & H had need of additional funds, the feedlot offered favorable interest rates (9 percent in October 1973) payable on feed prepayments. Robert's duties as grain buyer consisted of making contracts on behalf of H & H for grain purchases. During 1973 those grain purchases usually ranged from 1 to 5 million pounds, but some of them were as large as 26 million pounds. In making grain purchase contracts, Robert first contacted grain elevators or grain brokers to determine the amount of grain they had available for sale and for delivery at given dates and the price at which it was offered. After consulting with Philip Haynes (Haynes), general manager of H & H, to determine whether H & H was interested in buying such grain, Robert then made purchase contracts on behalf of H & H. As head bookkeeper, Eula was in *14 charge of H & H's bookkeeping and records. By 1978, she had 15 to 17 years of bookkeeping experience. In addition to their employment at H & H during 1973, petitioners bought cattle and had them fed at the feedlot. Robert also speculated in grain during 1973 in his own name and under the assumed business name of Brands Cattle Company. Prior to August 1972, he had not to any significant extent dealt in grain for his personal account. Petitioners' joint income tax returns for 1968 through 1970 and for 1972 showed no income from grain sales. On their 1971 income tax return, petitioners reported sales of $6,632.25 of grain which was purchased at a cost of $6,625. During 1973, grain prices rose rapidly. Robert purchased 11,383,705 pounds of grain for delivery at his direction, at a total cost of $327,749.11. The purchase price per cwt. ranged from $2.15 to $2.66 on grain delivered during January through March 1973, and from $2.75 to $4.55 on grain delivered from September through December 1973. In addition, Robert made speculative purchases of smaller amounts of grain, in truckloads, throughout this period. During 1973, Robert sold grain in a total amount of $395,647.52, with *15 sales prices ranging from $3 to $4.75 per cwt. from January 1973 through November 16, 1973. The deduction at issue stems from one of Robert's grain purchase contracts, one for 10 million pounds negotiated by Robert on February 2, 1973, and originally for H & H in the name of Ray Hendricks. The agreed price was $2.75 per cwt., and the contract called for delivery in October, November, and December 1973, with a two-cent-per-cwt. storage charge for every 10 days after January 1, 1974. Shortly after negotiating this contract, Haynes told Robert that the feedlot did not want to commit itself to purchase this 10 million pounds that far in advance. Robert thereupon called the seller, Barwise Elevator and Fertilizer (hereinafter Barwise), and informed it that H & H did not want the contract and that he would buy the 10 million pounds instead. Barwise agreed to the change. The February 2, 1973, contract was returned and marked void. As confirmation of the February oral change in the contract, Barwise issued a purchase contract dated June 4, 1973, in Robert's name for 10 million pounds of grain at the February price of $2.75 per cwt. with the same shipping schedule as set forth in the *16 February 2, 1973, contract. In October 1973, Robert sold to Goodpasture, Inc., approximately 3.5 million pounds of the 10 million pounds he had contracted from Barwise. One sale, made on October 2, 1973, covered 2 million pounds of grain at a price of $4.25 per cwt. for delivery within 20 days. Another sale, made on October 22, 1973, covered 1.5 million pounds at a sales price of $4.35 per cwt. for shipment in 30 days. On October 10, 1973, Robert contracted to purchase 3 million additional pounds of grain from Barwise at a price of $4.40 per cwt. with delivery to be made in January 1974, and with a two-cent-per-cwt. storage charge for every 10 days after January 31, 1974. On October 12, 1973, and November 6, 1973, petitioners made prepayments of $20,000 and $8,500, respectively, to H & H to cover the cost of feeding their cattle at the feedlot. At the close of 1973, $6,452.87 of the prepayments had not been used. This amount was sufficient to cover feed for petitioners' cattle for the period through February 28, 1974. On December 19, 1973, pursuant to Robert's February 1973 10-million pound grain purchase contract with Barwise, he purchased 1 million pounds of grain *17 from Barwise for $27,500 at a price of $2.75 per cwt. This purchase was documented by a warehouse receipt issued by Barwise and is the item here in dispute. After completing this 1-million pound purchase transaction, a balance of approximately 6 million pounds of grain was available for delivery on Robert's 10-million pound contract, and an additional 3 million pounds at $4.40 per cwt. was available on the October 10, 1973, purchase contract. Robert intended to use this grain for speculation purposes. During 1973, petitioners purchased two pieces of real property, the first sometime in the summer and the second in November. These properties had a total of 275 acres suitable for running cattle. Petitioners incurred the following expenses for equipment or for services performed on these two properties: $468 for a water tank; $1,450 for two cattle feeders; $1,210.05 for drilling a water well; $411.10 for testing the well; and $6,672.43 for fencing. Robert paid for the first two items by checks dated August 8, 1973, and November 17, 1973, respectively. The other items are evidenced by invoices dated November and December 1973. Through the latter part of 1973, petitioners held *18 the following numbers of head of cattle: July 31: 447 (272 at H & H and 175 at petitioners' ranch) October 1: 422 at H & H November 1: 422 at H & H December 1: 467 at H & H December 31: 327 at H & H In late December 1973, petitioners were discharged from their positions at H & H. On December 24, 1973, H & H, for its own account, obtained delivery of the remaining 6 million pounds of grain subject to the February 2, 1973, contract with Barwise. On January 16, 1974, petitioners initiated a lawsuit against Haynes and H & H for lost profits which petitioners alleged they could have realized on the sale of grain under the Barwise contract if H & H had not interfered with Barwise's performance of that contract. The suit charged not only that H & H had obtained delivery of the remaining 6 million pounds but also that its actions had caused Barwise to refuse to deliver to petitioners the 1 million pounds held under the warehouse receipt.
Sometime prior to February 7, 1974, the Texas State court which had jurisdiction over petitioners' lawsuit against Haynes and H & H directed the sale of the 1 million pounds of grain represented by the Barwise warehouse receipt. On February 7, 1974, a *19 contract of sale from Robert to Goodpasture, Inc., was executed for the 1 million pounds of grain at a sale price of $5.05 per cwt., a total of $50,500. Sometime in 1974, petitioners received from the State court $27,500, which was the cost of this grain. The profit on the sale, $23,000, was awarded to H & H sometime in 1975 in settlement of the lawsuit. Prior to having a certified public accountant prepare their income tax return for 1973, petitioners prepared a cash receipts and disbursements journal by reviewing their bank statements, deposits, and checks each month during 1973 and classifying each check in the cash disbursements journal according to the type of expenditures which the check represented. Petitioners prepared the cash disbursements journal to show the date of the check, payee, bank account, and type of expense to which each check was classified. Petitioners' expense classifications included separate columns for "Feed" and "Cattle & Grain Purchases." Petitioners classified the purchase of the 1 million pounds of grain on December 21, 1973, on line 24 of the cash disbursements journal, as follows: Cattle & Grain Date
Payee
Bank Account
Purchases
12/21
Roscoe State
Brands Cattle Co.
1,000,000 # milo
Bank
27,500.00
27,500.00
*20 Petitioners made no classification of this 1-million pound grain purchase as "Feed" expense under the column provided for "Feed" in their cash disbursements journal. In April 1974, petitioners took their bank statements, cash receipts and disbursements journal, and notes regarding ending inventory of grain to Reid Warner (Warner), a certified public accountant, for preparation and filing of their 1973 income tax return. Petitioners were referred to Warner by their prior tax preparer, Gene Berry, a certified public accountant, because a conflict of interest prevented the latter from preparing petitioners' 1973 tax return. Petitioners had never before employed Warner. Included in the materials furnished was a handwritten note prepared by petitioners showing the following: No Beginning Inventory in Grain Ending Grain Inventory 1,126,300 # $32,627.41 Disposable 126,300 # = 5,124.41 *
Based upon specific discussions of the $27,500 purchase of 1 million pounds of grain by petitioners with Warner, a review of the cash disbursements journal, and preparation of workpapers from that journal, petitioners and Warner decided to treat the *21 $27,500 amount as a cost of grain sold. Their reasoning was that the 1 million pounds of grain was then the subject of litigation, and petitioners did not control and could not sell it. Petitioners and Warner did not discuss the deductibility of this $27,500 grain purchase as a prepaid cattlefeed expense. Warner computed the cost of grain petitioner sold in 1973 to be $327,460.51, and that amount was deducted on the 1973 income tax return. In making this computation, Warner subtracted the disposable ending grain inventory of $5,127.41 [2] from total grain purchases of $332,587.92. These figures were set forth in the workpapers which he prepared from petitioners' cash receipts and disbursements journal and the notes regarding ending inventory. On schedule F, Farm Income and Expenses of their 1973 joint income tax return, petitioners reported receipts of $395,647.52 from grain purchased for resale and a cost of $327,460.51 for grain reported sold. This latter amount included the *22 $27,500 cost of the 1 million pounds of grain purchased from Barwise on December 19, 1973. Petitioners' income tax returns for 1973 and 1974 were audited by an agent of the Internal Revenue Service. The agent determined that petitioners' claimed cost of grain sold of $327,460.51 per the income tax return should be decreased by the amount of $27,500 for the cost of the grain which was the subject of litigation at the end of 1973. The computation of this adjustment, as set forth in the revenue agent's report dated September 19, 1975, and in the notice of deficiency, is as follows: Beginning Inventory
$ Purchases
332,587.92
Less Ending Inventory
32,627.41
Cost of Grain Sold per Audit
299,960.51
Cost of Grain Sold per Return
327,460.51
Decrease
$ 27,500.00
During the preliminary stages of the audit, neither petitioners nor Warner argued that the $27,500 in issue was deductible as a prepari feed expense. The agent's report notes the following argument advanced by petitioners: Taxpayer contends that since he was involved in a law suit at the end of 1973 and the courts had not decided who the grain belonged to, then he did not have to show it in his ending *23 inventory, but he should be able to deduct the cost of this grain since he had paid for it. Warner advanced the prepaid feed expense argument for the first time at district conference. On schedule F, Farm Income and Expenses, of the 1974 income tax return, petitioners reported the $27,500 as income from grain held for resale, reflecting the fact that they were reimbursed the amount of their cost upon the court-ordered sale of the 1 million pounds of grain to Goodpasture, Inc., on February 7, 1974. Consistent with his treatment of this item on petitioners' 1973 income tax return, respondent decreased income from grain held for resale in 1974 by $27,500 and determined petitioners were entitled to an overpayment credit of $4,568.43 for that year. OPINION At issue is the tax treatment of the $27,500 cost of 1 million pounds of grain purchased in December 1973, from Barwise which petitioners claim to be deductible as a prepaid feed expense. Section 162 allows a deduction for ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. Section 1.162-12(a), Income Tax Regs., states that-- The purchase of feed and other costs *24 connected with raising livestock may be treated as expense deductions insofar as such costs represent actual outlay * * *. Contending that petitioners bought the grain not to feed cattle but rather to hold for resale, respondent would have us deny the deduction. If the Court finds that petitioners bought the grain in order to use it as cattlefeed, respondent concedes the deductibility of the amount in issue. Accordingly, the determination of the case depends on a finding of petitioners' intent. On this issue, petitioners bear the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering, 290 U.S. 111 (1933). We do not think they have shown that they bought this grain to feed their cattle. We begin with the fact that Robert contracted to purchase the disputed grain in February 1973. He expressly or implicitly admits that the other 9 million pounds of grain covered by the Barwise contract were contracted for speculation purposes. There is nothing in the history of the Barwise transaction prior to December 19, 1973, even suggesting any different intention with respect to the 1 million pounds. Indeed, at the time the Barwise *25 contract was made, there is no showing that petitioners owned any cattle outside the feedlot or owned any facilities where they could precondition cattle for feeding. It is true that on December 21, 1973, Robert paid Barwise for the 1 million pounds of grain and received therefor a warehouse receipt dated December 19, 1973. But only a few days later, he and Eula were dismissed from their jobs at H & H. [3] Petitioner's original petition in the suit in the Texas State court alleged that on December 24, 1973, Haynes and H & H induced Barwise to breach its contract with Robert. With events occurring as fast as they were during this period, we think it highly unlikely that Robert would buy grain to feed ranch cattle which he did not then own. While an effort was made to show that Robert expected H & H to accept part of this grain in kind to be placed in a "grain bank" to feed his cattle at the feedlot, the evidence is quite clear that in 1973 and early 1974 H & H did not have a grain bank program. Under the circumstances, it is not reasonable that he expected H & H to make an exception to its normal operating procedures to accommodate him. The more reasonable inference is that *26 he bought this 1 million pounds of grain and took a warehouse receipt for it in an attempt to protect the gain which could be realized from the resale of that grain. The manner in which petitioners treated the $27,500 cost of this grain on their accounting records and their 1974 income tax return confirms our finding that it was bought for resale. As stated in our findings, petitioners classified in their accounting records this $27,500 expenditure as a grain purchase rather than as a feed expenditure. On their cover note to Warner, who prepared their 1973 income tax return, they included this item as part of their grain inventory. Since Eula had worked as a bookkeeper for approximately 10 years and Robert had spent much of his career in the cattle business, we do not think this classification in their records was inadvertent. This treatment in their *27 records and in their 1973 income tax return is an admission, though not conclusive, entitled to weight in deciding whether this grain was bought for resale or as feed for cattle. See Waring v. Commissioner,412 F.2d 800, 801 (3d Cir. 1969), affg. per curiam a Memorandum Opinion of this Court. Petitioners' discussions with revenue agents during the audit are consistent with these classifications in their records and on their 1973 return. In a September 19, 1975, report filed by a revenue agent, there is no mention of an argument that the $27,500 was deductible as a prepaid cattlefeed expense. Instead, petitioners' argument consists of an evidently sincre but clearly mistaken position that they were entitled to a deduction because they had made a cash outlay for an item which was later removed from their control. It was only at the district conference that petitioners and their accountant brought up the prepaid feed expense theory. The evidence, as we view it, requires a holding that the 1 million pounds of grain in dispute was purchased for resale. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.↩
*. 1,000,000 # were taken by the court↩
2. On a handwritten note furnished to Warner, petitioners listed the amount of the disposable ending inventory as $5,124.41. There is no explanation for this discrepancy in the record.↩
3. Petitioners' brief contains the following: On December 24, 1973, petitioner were relieved of their duties at H & H Feed Lot because they allegedly were taking corporate opportunities and self-dealing in milo [grain]. A criminal fraud trial was held against Robert Downs and he was found innocent of any wrongdoing.↩