EDWARD WILKOF AND RUTH WILKOF, ERVIN WILKOF AND MARIE WILKOF, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
WILKOF v. COMMISSIONER
Docket No. 5750-77.
United States Tax Court
T.C. Memo 1978-496; 1978 Tax Ct. Memo LEXIS 20; 37 T.C.M. (CCH) 1851-31; December 13, 1978, Filed Zolman Cavitch and Harvey L. Frutkin, for the petitioners. Robert N. Armen, Jr. and Buckley D. Sowards, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Petitioner
Year
Deficiency
Edward Wilkof and Ruth Wilkof
1973
$ 112,910
Ervin Wilkof and Marie Wilkof
1973
115,198
The issues for decision are: 1. Whether intercorporate transfers of $420,000 from Wilkof Structural Steel Corporation to TWM Manufacturing Co., Inc., corporations wholly owned by petitioners, constituted bona fide indebtedness. 2. If the transfers did not constitute bona fide indebtedness, whether petitioners received a constructive dividend in 1973 upon the transfer of such funds. *21 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Edward Wilkof and Ruth Wilkof, husband and wife, and Ervin Wilkof and Marie Wilkof, husband and wife, resided in Canton, Ohio at the time they filed the petition in this case. Each couple filed their joint 1973 Federal income tax return with the Internal Revenue Service Center, Cincinnati, Ohio. Edward Wilkof and Ervin Wilkof (hereinafter petitioners) are brothers. They have been active in the iron and steel business since the 1930's. On September 1, 1953, Wilkof Structural Steel Corporation (hereinafter WSS) was incorporated under the laws of the State of Ohio. From its formation and until October 16, 1962, petitioners and their father, Louis Wilkof, each owned an equal, one-third interest in WSS. Since October 16, 1962, when WSS redeemed all of the shares owned by Louis Wilkof, the petitioners each owned an equal, one-half interest in WSS. Petitioners have always served as officers of WSS. On October 1, 1962, Wilkof-Morris Steel Corporation (hereinafter W-M) was incorporated under the laws *22 of the State of Ohio. From its incorporation until December 13, 1972, WSS and Morris Steel Co., Inc., each owned an equal, fifty percent interest in W-M. Morris Steel Co., Inc., is an Ohio corporation in which Morris, Darwin and Jack Wilkof (an uncle and cousins of petitioners) originally had an interest and in which Darwin and Jack continue to have an interest. Since its formation, W-M has actively engaged in the iron and steel business. Petitioners served as officers of W-M from its incorporation until September 30, 1971. Subsequent to October 1, 1962, WSS did not actively engage in the iron and steel business. Its principal assets consisted of its stock interest in W-M and commercial real estate leased to W-M and used by that corporation in its business. WSS reported taxable income in the following amounts on its Federal income tax returns: Fiscal Year Ending
Taxable Income
8-31-68
$ 37,714.97
8-31-69
$ 32,265.32
8-31-70
$ 30,578.27
8-31-71
$ 32,472.86
8-31-72
$ 27,817.26
8-31-73
$ 330,549.31
8-31-74
[3,326.00]
8-31-75
$ 32,586.00
8-31-76
$ 28,298.00
8-31-77
$ 18,961.00
The balance sheet of WSS at August 31 of each of the following *23 years was as follows: Fiscal Year Ending
Position
8/31/70
Assets
$ 412,494.85
Liabilities
$ 101,062.36
Equity
$ 311,432.49
8/31/71
Assets
$ 410,786.32
Liabilities
$ 76,050.81
Equity
$ 334,735.51
8/31/72
Assets
$ 483,713.51
Liabilities
$ 128,095.91
Equity
$ 355,617.60
8/31/73
Assets
$ 771,885.83
Liabilities
$ 200,678.43
Equity
$ 571,207.40
8/31/74
Assets
$ 747,906.00
Liabilities
$ 195,729.00
Equity
$ 552,177.00
8/31/75
Assets
$ 966,109.00
Liabilities
$ 362,659.00
Equity
$ 603,450.00
8/31/76
Assets
$ 979,620.00
Liabilities
$ 368,048.00
Equity
$ 611,572.00
8/31/77
Assets
$ 888,849.00
Liabilities
$ 253,097.00
Equity
$ 635,752.00
WSS paid each petitioner cash dividends in the following amounts: Fiscal Year Ending
Amount
8/31/67 $ 136
8/31/68 $ 136
8/31/69 $ 136
8/31/70 $ 136
8/31/71 $ 136
8/31/72 $ 136
8/31/73 $ 136
8/31/74 $ 136
8/31/75 $ 272
8/31/76 $ 272
8/31/77 $ 272
On November 8, 1968, TWM Manufacturing Company, Inc. (hereinafter TWM) was incorporated under the laws of the State of Ohio. From the date of incorporation *24 to March 1, 1969, petitioners and their cousins Darwin Wilkof and Jack Wilkof, each owned a twenty-five percent interest in TWM.Capital contributions in the amount of $ 1,000 were made by each stockholder. Shortly after its incorporation the interests of Darwin and Jack Wilkof were redeemed. Thereafter and until the present, petitioners have been equal fifty percent shareholders in TWM. Petitioners have always served as officers of TWM. TWM was organized for the purpose of developing and manufacturing an axle suspension system for truck trailers known as the "Turner Quick-Lift Axle." TWM initially acquired worldwide manufacture and sale rights to the Turner Quick-Lift Axle system from its inventor. Thereafter, TWM secured twelve U.S. patents on subsequent redesigns of the original axle suspension. In addition, TWM sought patent protection for its axle in twenty-six foreign countries. In order to facilitate the marketing of the axle suspension system, Turner Quick-Lift Corporation (hereinafter TQL) was organized under the laws of Ohio on March 9, 1969. Since its inception petitioners have been officers and equal fifty percent shareholders of TQL. Petitioners were enthusiastic *25 about the potential market for their product. Nevertheless, development of a viable and reliable axle suspension unit did not occur overnight nor did a profitable operation occur immediately. First, TWM experienced mechanical and operational difficulties with their early axle suspension unit. This resulted in TWM's failure to secure the necessary government certification of the axle's load capacity. Thus, TWM and TQL expended approximately $150,000 for research and development, which resulted in the development of a "high-strength" axle suspension unit in 1972. This model, which received government certification, resulted in a dramatic increase in TQL sales. TQL unit sales increased by 336 percent from 1972 to 1973 and by an additional 148 percent from 1973 to 1974.
In addition to technical and developmental problems, TWM determined in 1971 that one or more of its patents was being infringed and commenced litigation, which has cost to the present a minimum of $200,000. Finally, the general economy in 1974 and the resultant fall-off in truck purchases affected TWM and TQL's ability to become viable and profitable operations. TWM reported taxable income in the following amounts *26 on its Federal income tax returns: Fiscal Year Ending
Taxable Income
3/31/70 $ (6,423.24) 3/31/71
(22,360.67) 3/31/72
(38,686.13) 3/31/73
(59,111.60) 3/31/74
(89,841.00) 3/31/75
(18,577.00)*
3/31/76
(87,954.00)*
3/31/77
(51,779.00)*
12/31/77
115,800.00 *
The balance sheet position of TWM for each of the following years was as indicated: Fiscal
Year Ending
Position
3/31/70
Assets $ 56,107.37
Liabilities $ 58,530.61
Equity
($ 2,423.24)
3/31/71
Assets $ 215,094.01
Liabilities $ 241,878.22
Equity
($ 26,784.21)
3/31/72
Assets $ 297,146.07
Liabilities $ 362,652.01
Equity
($ 65,505.94)
3/31/73
Assets $ 526,829.42
Liabilities $ 660,496.36
Equity
($ 133,666.94)
3/31/74
Assets $ 880,726.00
Liabilities
$ 1,109,072.00
Equity
($ 228,346.00)
3/31/75
Assets
$ 1,064,472.00
Liabilities
$ 1,329.214.00
Equity
($ 264,742.00)
3/31/76
Assets
$ 1,161,155.00
Liabilities
$ 1,526,187.00
Equity
($ 365,032.00)
3/31/77
Assets $ 887,995.00
Liabilities
$ 1,320,531.00
Equity
($ 432,536.00)
12/31/77
Assets $ 959,625.00
Liabilities
$ 1,285,097.00
Equity
($ 325,472.00)
*27 TQL reported taxable income in the following amounts on its Federal income tax returns: Fiscal
Year Ending
Taxable Income
3/31/70 $ (7,442.28) 3/31/71 $ (8,912.77) 3/31/72
[25,477.09)
3/31/73
[24,695.24)
3/31/74
[53,736.00)
3/31/75
[88,655.00) *
3/31/76
[90,514.00) *
3/31/77 $ 5,768.00 *
12/31/77
$ 52,808.00 *
The balance sheet position of TQL for each of the following years was as follows: Fiscal Year Ending
Taxable Income
3/31/70
Assets
$ 33,569.56
Liabilities
$ 39,011.84
Equity
( $ 5,442.28)
3/31/71
Assets
$ 66,906.48
Liabilities
$ 81,261.53
Equity
($ 14,355.05)
3/31/72
Assets
$ 113,231.70
Liabilities
$ 153,063.84
Equity
($ 39,832.14)
3/31/73
Assets
$ 216,410.57
Liabilities
$ 280,957.95
Equity
($ 64,547.38)
3/31/74
Assets
$ 272,078.00
Liabilities
$ 390,266.00
Equity
($ 118,188.00)
3/31/75
Assets
$ 298,032.00
Liabilities
$ 504,888.00
Equity
($ 206,856.00)
3/31/76
Assets
$ 296,127.00
Liabilities
$ 593,497.00
Equity
($ 297,370.00)
3/31/77
Assets
$ 225,456.00
Liabilities
$ 517,057.00
Equity
($ 291,601.00)
12/31/77
Assets
$ 394,241.00
Liabilities
$ 633,084.00
Equity
($ 238,843.00)
*28 In view of TWM's initial difficulties and its consistent deficit position in its early years, outside financing became necessary. The following schedule reflects the history of TWM's borrowing and repayments with respect to loans from financial institutions through December 31, 1977: Date Posted
Bank
Loan
Repayment
Balance
10/31/69
Harter
$ 25,000.00
$ 25,000.00
6/30/70
Harter
25,000.00
50,000.00
9/30/70
Harter
25,000.00
75,000.00
10/31/70
Harter 25,000.00
100,000.00
12/31/70
Harter
25,000.00
125,000.00
1/31/71
Harter
25,000.00
150,000.00
2/28/71
Harter
50,000.00
200,000.00
3/31/71
Harter
$200,000.00
0
1/31/72
United National
300,000.00
300,000.00
10/31/72
United National
40,000.00
340,000.00
1/31/73
United National
240,000.00
100,000.00
4/30/73
United National
200,000.00
300,000.00
5/31/73
United National
5,000.00
295,000.00
6/30/73
United National
5,000.00
290,000.00
7/31/73
United National
100,000.00
5,000.00
385,000.00
8/31/73
United National
5,000.00
380,000.00
9/30/73
United National
5,000.00
375,000.00
10/31/73
United National
5,000.00
370,000.00
11/30/73
United National
100,000.00
5,000.00
465,000.00
12/31/73
United National
75,000.00
5,000.00
535,000.00
1/31/74
United National
5,000.00
530,000.00
2/28/74
United National
5,000.00
525,000.00
3/31/74
United National
5,000.00
520,000.00
4/30/74
United National
75,000.00
5,000.00
590,000.00
5/31/74
United National
5,000.00
585,000.00
6/30/74
United National
5,000.00
580,000.00
7/31/74
United National
5,000.00
575,000.00
8/31/74
United National
5,000.00
570,000.00
9/30/74
United National
5,000.00
565,000.00
10/31/74
United National
5,000.00
560,000.00
11/30/74
United National
5,000.00
555,000.00
12/31/74
United National
5,000.00
550,000.00
1/31/75
United National
5,000.00
545,000.00
2/28/75
United National
5,000.00
540,000.00
3/31/75
United National
5,000.00
535,000.00
3/31/75
United National
1,018.49
533,981.51
4/01/75 through
5/31/77 (26 payments of $5,000 each)
130,000.00
403,981.51
8/15/77
3,981.51
400,000.00
8/15/77 through
12/31/77 (5 payments of $4,750 each)
23,750.00
376,250.00
*29 In addition to the above repayments of principal, TWM paid United National Bank 7 1/2 percent interest on its loans. On March 31, 1971, petitioners each loaned $100,000 to TWM. Absent these loans to TWM by petitioners, TWM would have had insufficient funds to repay the outstanding balance owed the Harter Bank on March 31, 1971. On January 31, 1972, these said amounts were repaid by TWM to petitioners. This repayment was made possible by TWM borrowing $300,000 from United National Bank of Canton, Ohio (hereinafter United). TWM borrowed another $40,000 from United on October 31, 1972. All loans from United were personally guaranteed by petitioners and their wives. Moreover, personal insurance on petitioners' lives in the face amount of $300,000 was conditionally assigned to the bank as security for such loans. Finally, after March 28, 1973, United held, as additional security for all the then present and subsequent indebtedness of TWM, petitioners' shares in WSS. United's requirement of security for loans to TWM was effected pursuant to routine policy of United rather than by reason of concern for the particular loans made to TWM. On December 13, 1972, WSS sold one-half *30 of its fifty percent interest in W-M to Idamor Realty Company, a partnership comprised of Darwin and Jack Wilkof, for $425,000. As a result of this sale WSS transferred funds in the following amounts to TWM: Date
Amount
1-16-73
$ 100,000
1-17-73
200,000
1-26-73
70,000
3-23-73
50,000
$ 420,000 TWM deposited $100,000 on January 16, 1973, $200,000 on January 17, 1973, and $70,000 on January 29, 1973, into its business checking account at United. On January 17, 1973, and January 18, 1973, TWM drew checks in the amount of $40,098.63 and $200,000, respectively, to the order of United. These checks represent the $240,000 repayment made by TWM to United on January 31, 1973. Absent the transfer of funds from WSS, TWM would have had insufficient funds to make the $240,000 repayment at that time. Prior to TWM's repayment, however, United did not indicate that any principal payment was required or desired. In addition, TWM was not in default on its obligation with United. TWM subsequently borrowed an additional $550,000 from United subject to the same security arrangements previously denominated. The balance of the transfer from WSS to TWM was used to satisfy *31 TWM's accounts payable and to provide working capital. TWM made no effort to obtain the funds received from WSS from any financial institution, including United. The transfer from WSS to TWM was reflected on the corporations' books and records as an asset of WSS and a liability of TWM. No promissory note or other written unconditional promise to pay was executed at the time of transfer. Likewise, no fixed maturity date was specified and no schedule for the repayment of principal and interest was established. Moreover, no specific interest rate was agreed upon. Finally, WSS did not require TWM to establish any sinking fund or pledge any collateral, nor did WSS demand personal guarantees from petitioners. The extent of transfers by WSS to TWM and their repayment are as follows: Date Posted
To TWM by WSS
To WSS by TWM
Balance
11/30/71
$ 26,500.00
$ 26,500.00
1/31/72
31,500.00
$ 56,500.00
1,500.00
2/28/72
2,500.00
(1,000.00)
3/31/72
1,500.00
460.00
40.00
4/30/72
100.00
(60.00 )
8/31/72
2,000.00
1,940.00
1/31/73
370,000.00
371,940.00
3/31/73
50,000.00
421,940.00
11/30/73
36,640.00 385,300.00
1/31/74
6,400.00
378,900.00
2/26/74
1,000.00
377,900.00
9/30/75
6,000.00
383,900.00
4/30/76
6,000.00
389,900.00
5/31/76
1,500.00
391,400.00
9/30/76
52,669.50 *
444,069.50
10/31/76
6,000.00
438,069.50
5/31/77
15,371.00 **
453,440.50
6/30/77
3,423.00
450,017.50
7/31/77 $ $ 123.00
$449,894.50
8/31/77
123.00
449,771.50
9/30/77
123.00
449,648.50
10/31/77
123.00
449,525.50
11/30/77
371.55
449,153.95
12/31/77
1,927.00 ***
451,080.95
*32 Amounts indicated on the foregoing schedule with one or more asterisks represent amounts posted on TWM's books and records as interest as follows: Prior to the time of the transfers, petitioners had been contemplating merger of WSS, TWM and TQL and had sought professional advice on the feasibility and advisability of such a plan. Petitioners were aware at the time of the transfer of funds between WSS and TWM that the proposed merger would extinguish any indebtedness owed between the merging corporations. Merger, petitioners believed, would provide an enhanced financial structure for TWM in order to attract better customers and simplify overall accounting and legal record-keeping. On December 23, 1977, WSS, TWM, TQL and another Ohio corporation owned by petitioners entered into a "Plan of Reorganization and Agreement of Merger." Pursuant to such plan, TWM and TWL merged into WSS effective December 31, 1977. The name of the surviving corporation was subsequently changed from WSS to Turner Quick-Lift Corporation. OPINION At issue is whether the transfer of $420,000 from WSS to TWM, corporations *33 wholly owned by petitioners, constituted a constructive dividend to petitioners. In resolving the issue, we must first decide if the transfer constituted bona fide indebtedness. If the transfer was a bona fide loan, it does not constitute a constructive dividend. If the transfer was not bona fide indebtedness, however, we must decide whether it was made for the benefit of petitioners and therefore constitutes a constructive dividend. Whether or not the advances by WSS to TWM represent bona fide debt is a question of fact. No single characteristic is decisive in the determination of whether debt exists. John Kelley Co. v. Commissioner,326 U.S. 521 (1946). For petitioners to prevail they must prove the reality of the indebtedness. Gooding Amusement Co. v. Commissioner,23 T.C. 408 (1954), affd. 236 F.2d 159 (6th Cir. 1956); Rule 142, Tax Court Rules of Practice and Procedure.
In determining whether the transactions constituted bona fide loans, the intent of the parties is important. Donisi v. Commissioner,405 F.2d 481, 483 (6th Cir. 1968); Byerlite Corporation v. Williams,286 F.2d 285, 290-294 (6th Cir. 1960). *34 However, in evaluating the declarations of the parties that they intend a transaction to constitute a loan, such declarations "[are] insufficient if it fails to meet more reliable indicia of debt which indicate the intrinsic economic nature of the transaction." Alterman Foods, Inc. v. United States,505 F.2d 873, 877 (5th Cir. 1974); Berthold v. Commissioner,404 F.2d 119, 122 (6th Cir. 1968). As a result, we must weigh the factors which are generally regarded as identifying the characteristic differences between debt and equity. See Austin Village, Inc. v. United States,432 F.2d 741, 745 (6th Cir. 1970), for a comprehensive list of the criteria to consider. In Litton Business Systems, Inc. v. Commissioner,61 T.C. 367, 377 (1973), we said: the determinative question, to which an evaluation of the various independent factors should ultimately point, is as follows: Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship? Petitioners assert that a bona fide debt was created *35 since (1) TWM intended to repay WSS; (2) both TWM and WSS recorded the transaction on their books as a liability and asset, respectively; (3) partial repayment was made; (4) interest on the transfer was posted on the books of the two companies; and (5) the buy-sell arrangement in respect of petitioners' ownership of WSS stock necessitated that the corporations treat the transfers as debt; and (6) upon the merger of TWM into WSS in 1977, TWM's obligation to WSS was extinguished. Respondent maintains, on the other hand, that no bona fide debt was created upon the transfer of funds from WSS to TWM. Respondent asserts that the following factors are objective indications that no debt was created: (1) no promissory note or other written, unconditional promise to pay was ever executed; (2) no fixed maturity date was ever specified; (3) repayment of principal and "interest" would be made out of the profits of TWM; (4) no fixed schedule for payment of interest or principal was established; (5) no pledge of collateral was made or security agreement executed; (6) no sinking fund was established; (7) WSS did not require personal guaranties by petitioners; (8) no apparent right existed for *36 WSS to enforce payment; (9) petitioners had common control of TWM and WSS; (10) an insignificant amount of funds were transferred from TWM to WSS; (11) TWM was incapable of repaying the transfer because of its deficit position and operational losses; (12) to the extent that TWM's commercial lender required the pledge of petitioners' shares in WSS, the transfers from WSS to TWM were subordinated to United's loan; (13) TWM failed to obtain or try to obtain financing from a financial institution; and (14) TWM was thinly capitalized. Moreover, respondent contends that his view is buttressed by the dissimilarities between TWM's "loan" histories with WSS and with United. Finally, respondent maintains that in light of the circumstances governing the transfer, the subsequent use of the money, and the expectation that future merger would obviate any need to pay back the transferred funds, the transfers cannot be considered bona fide indebtedness. We agree with respondent that the transfers from TWM to WSS did not constitute bona fide indebtedness. We are not persuaded by petitioners' testimony that TWM intended to repay WSS. As we have noted earlier, declarations of intent, particularly *37 in situations such as these, must be viewed with some diffidence unless supported by objective factors demonstrating economic reality. "Such allegedly objective economic indicia of debt such as consistent bookkeeping and consistent financial reporting on balance sheets are in our opinion little more than additional declarations of intent, without any accompanying objective economic indicia of debt." Alterman Foods, Inc. v. United States,supra at 879.
Unlike TWM's obligations to United, which were evidenced by formal documents, by periodic payments of principal, and by interest at a fixed rate, WSS's "loan" to TWM was devoid of any such indicia. Moreover, no sinking fund was established, no security was given, and no personal guarantees were made.Although "interest accrued" to WSS by TWM was posted on the companies records, we note that such amounts were posted subsequent to the filing of a protest in this case. Furthermore, petitioner Edward Wilkof, although testifying that an interest rate had been fixed, was unable to remember or specify the rate of interest WSS charged TWM on the loan. Most telling perhaps was petitioner's testimony that the "loan" was *38 to be repaid out of TWM's hopes for future profits. See Austin Village, Inc. v. Commissioner,supra at 745-46. We find the evidence of "repayment" by TWM inconclusive. First, we note that TWM consistently made payments on its obligation to United. Second, an earlier transfer of funds by WSS to TWM, unlike the small and inconclusive payments made here, was promptly paid off. Rather, we think that no realistic expectation of repayment was present here. By the time of the merger in 1977, the balance owed WSS had not decreased, but, accounting for "interest accrued," had increased.Although one substantial transfer of funds from TWM to WSS did occur in late 1973, we are not satisfied that this, standing alone, provides the necessary indicia of debt to sustain petitioners' burden. Finally, we note that the anticipated merger would obviate any necessity of repaying a "loan" between TWM and WSS. Petitioners also rely on the provisions of a buy-sell agreement with respect to their ownership of WSS stock. They maintain that unless the transfers from WSS to TWM were bona fide loans, upon the death of either petitioner when WSS would redeem the decedent's shares, the decedent *39 would in effect be making a gift to his brother's family. We assume that petitioners believe that only if the transfer constitutes a loan would the decedent's estate, upon redeeming the shares, receive in such redemption his percentage interest in the value of the outstanding "loan". Such an argument is specious and begs the ultimate question of whether the transfer constituted a constructive dividend. First, if the transfer was not debt but a capital contribution by WSS to TWM, the shares of WSS in redemption would reflect the percentage value of WSS's investment in TWM. Second, if the transfer constituted a constructive dividend to petitioners, i.e., a distribution to petitioners and investment of such money in TWM as capital contributions, the funds having passed out of WSS would be unaffected by the subsequent death of either petitioner and the operation of the buy-sell agreement. We conclude on the basis of the evidence presented that the transfers from WSS to TWM did not constitute bona fide indebtedness. Section 316, Internal Revenue Code, provides that the term "dividend" means any distribution of property made by a corporation to its shareholders:
*40 (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. It is not necessary that a distribution of corporate property be made directly to the shareholders, as is the case in a declared cash dividend, in order for a dividend to arise. A transfer of funds between related corporations may generate constructive dividend consequences if the transferred funds are expended either for a shareholder's personal benefit or in discharge of his personal obligations. The crucial inquiry for determining if the transfer of funds between related corporations results in a constructive dividend is whether the funds were transferred primarily for the stockholder's benefit.The "benefit" has been required generally to be direct, Schwartz v. Commissioner,69 T.C. 877, 884 (1978), and the concept of benefit has been broadly construed. See, e.g., Rushing v. Commissioner,52 T.C. 888 (1969); *41 J. F. Stevenhagen Co. v. Commissioner,T.C. Memo. 1975-198, affd. 551 F.2d 106 (6th Cir. 1977); McLemore v. Commissioner,T.C. Memo. 1973-59, affd. 494 F.2d 1350 (6th Cir. 1974). The mere fact of common ownership, however, does not automatically mandate constructive dividend treatment. The Commissioner's determination of a deficiency is presumed correct. The taxpayer must show that the transfer of funds was not primarily for his personal benefit but rather primarily for a legitimate corporate purpose. If he can establish a corporate purpose which both justifies the transfer and is the primary cause of the transfer, he has effectively disproved that any constructive dividend has occurred. Petitioners contend that the purpose of the transfer was primarily for corporate reasons and did not result in, or inure to, their benefit. They assert that they had planned to merge WSS and TWM and that the funds were necessary in order to enhance TWM's equity position so that it could attract better clients and to ensure TWM's development into a viable and profitable concern with which WSS would want to merge. Thus, petitioners *42 maintain that since merger was anticipated, the transfer of funds to ensure a strong TWM in the planned and subsequently effected merger with WSS was a valid corporate purpose. Respondent, to the contrary, contends that the transfers were primarily for the benefit of petitioners in that (1) they were able to use WSS as a source of risk capital for TWM without using their personal resources; (2) petitioners could carry on a business with extremely thin capitalization without having their personal funds subordinated to TWM's substantial indebtedness; (3) petitioners were able to use the money in WSS interest-free; (4) the value of petitioners' equity interest in TWM was enhanced greatly by these transfers; (5) petitioners were relieved of potential liability on their personal guarantees of loans made by United to TWM which were partially paid off with the funds transferred by WSS. We agree with respondent that the transfer of funds from WSS to TWM constituted a primary benefit to petitioners, on the basis of all the grounds enumerated by the respondent except the interest-free use of money. See Joseph Lupowitz Sons, Inc. v. Commissioner,T.C. Memo. 1972-238, affd. *43 and remanded 497 F.2d 862 (3d Cir. 1974). Petitioners misconstrue the nature of "corporate purpose" in this case. A corporate purpose, be it specific or general, must demonstrate the necessary relationship between the transferor corporation and transferee corporation such that a transfer of funds would be in the best interests of the transferring corporation at the corporate level. To the extent that a corporation "loans" funds to another related corporation, creating an obligation on the corporate level, we have always construed such a transfer as having a primary corporate purpose, whether or not the corporations were in similar, tangential or supporting fields. Joseph Lupowitz Sons, Inc. v. Commissioner,supra;Koufman v. Commissioner,T.C. Memo. 1976-330.If we do not find a loan to exist, and a corporation transfers funds or property to a related corporation, such transfers are highly suspect. In that case the transfers may in fact be a circuitous route at achieving capital financing of the transferee corporation without dividend treatment by the transferor to the common shareholder. If justifiable business reasons exist, *44 however, that could account for the transfer of funds between related corporations, such reasons would be sufficient to override any benefit that might incidentally or derivately accrue to the transferor's shareholders. For example, in Rapid Electric Co. v. Commissioner,61 T.C. 232 (1973), we held that the failure on the part of Rapid Electric's sister corporation to collect on a net balance of account receivables from Rapid Electric did not constitute a constructive dividend to the sister-corporation's shareholders. Rather, we viewed the transfer as primarily for a legitimate corporate purpose. Rapid Electric was the sole purchaser of the goods produced by the sister corporation, which needed the buyer and could not afford to lose Rapid Electric as a purchaser. In light of Rapid's financial difficulties, and the fact of the supplier-buyer relationship, we concluded that a legitimate corporate purpose was shown. In Rushing v. Commissioner,52 T.C. 888 (1969), a shopping development corporation transferred $67,000 to a residential land development corporation which planned to develop a residential complex adjacent to the shopping center. In finding *45 that the transfer did not constitute a constructive dividend, the Court noted that the shopping development corporation: had a significant interest in Briercroft's successful development of its acreage. Briercroft's success in the development of homesites on land adjacent to L.C.B.'s shopping center would inevitably lead to increased patronage for the shopping center. [Rushing v. Commissioner,supra at 894.] Similarly, proper corporate purposes were found in Schwartz v. Commissioner,supra, and Dean v. Commissioner,57 T.C. 32 (1971). Unlike our opinions in Schwartz,Rushing and Rapid Electric Co., here no satisfactory business purpose has been advanced for the transfers. While it is true that petitioners intended TWM to merge with WSS, the purposes of merger were admittedly to enhance TWM's balance sheet position with an additional source of equity. As petitioners testified, WSS and TWM did not have any business relationship to each other other than common ownership. No supplier-buyer relationship was present as in Rapid Electric Co. v. Commissioner,supra.No adjacent land corporations *46 were present as in Rushing v. Commissioner,supra.The future merger and the transfer of funds to strengthen and develop TWM represented a benefit to TWM, butnottoWSS. See Knipe v. Commissioner,T.C. Memo. 1965-131, affd. per curiam sub. nom. Equitable Publishing Co. v. Commissioner,356 F.2d 514 (3d Cir. 1966). Petitioner has not demonstrated any corporate purpose that WSS achieved by its transfer of $420,000 to TWM other than supplying a large amount of risk capital to a corporation wholly unrelated in function and operation to WSS. In McLemore v. Commissioner,T.C. Memo. 1973-59, affd. 494 F.2d 1350 (6th Cir. 1974), we held that the transfer of funds from one company (Realty) to another (Motors) in order to assist the latter retain a profitable status and to protect the former's interest as landlord in property rented by Motors was insufficient to constitute a primary business purpose. Instead, we held that the funds, which were paid to the taxpayers by Motors in satisfaction of Motors' debt to them, constituted a constructive dividend. Similarly, in J. F. Stevenhagen Co. v. Commissioner,supra, *47 we held that advances from one corporation (JFS) to another (Jon-Way) were for the purpose of getting JonWay underway and later for furthering Jon-Way's business, and, in general, making Jon-Way a viable and profitable corporation. We concluded that such transfers served to enhance the value of the taxpayer's 50 percent interest in Jon-Way and, as such, constituted a primary benefit to the shareholder. Although the Court acknowledged that JFS might gain if Jon-Way became profitable, it viewed such a possibility as merely derivative to the taxpayer's enhanced investment in Jon-Way. Petitioner's reliance on Joseph Lupowitz Sons, Inc. v. Commissioner,supra, is misplaced. Although we did not specifically denominate the "transfers" of funds as loans in that case, we found the continued transfers back and forth between the related corporations constituted corporate obligations, which were intended to be repaid. In Lupowitz the borrowing corporation was a profitable concern, capable of repayment. In addition, evidence of repayments were clear and not inconclusive. No evidence has been offered here that TWM had the capacity to repay or would ever realistically *48 have the capacity to repay. In fact, such "loans" have not been repaid. Although we did not find in Lupowitz a specific business purpose for the transfers, we think that the Lupowitz case clearly falls within the general rule that, if an obligation exists, sufficient corporate business purpose exists. See J. F. Stevenhagen Co. v. Commissioner,supra.Since we have earlier found that no corporate obligation was created here, we find Lupowitz inapposite. Petitioners also contend that the absence or presence of a direct primary benefit to a shareholder is the sole test which determines whether or not constructive dividend treatment is appropriate, without regard to whether a corporate purpose exists. Petitioner cites Joseph Lupowitz Sons, Inc. v. Commissioner,supra and Laure v. Commissioner,70 T.C. 1087 (1978), in support of such a view. We do not think that Laure and Lupowitz stand for such a proposition. Moreover, such a position is contrary to all other opinions in this area. Petitioners must show that transfers between related corporations, except for bona fide debt, were primarily for corporate *49 purposes and not primarily for shareholder benefit. Laure does support the proposition, however, that to the extent that a taxpayer can show an absence of direct benefit to himself he may escape constructive dividend treatment even absent a corporate purpose. Laure v. Commissioner,supra at 1108. In any event, we think the petitioners have failed to show an absence of a direct and primary benefit here. Respondent argues that the petitioners' investment in TWM was enhanced by the transfer. We have previously held that such enhancement is a direct and primary benefit sufficient to constitute a constructive dividend. See J. F. Stevenhagen, Co. v. Commissioner,supra;McLemore v. Commissioner,supra.See also Sparks Nugget, Inc. v. Commissioner,458 F.2d 631, 632 (9th Cir. 1972); Sammons v. United States,433 F.2d 728 (5th Cir. 1970). Here the transfer of funds strongly enhanced petitioners' investment. Petitioners testified that TWM needed the funds from WSS to improve its capital structure and to attract better customers. Moreover, such transfers enabled TWM to increase *50 its ability to borrow from United. In addition, approximately $240,000 of the $420,000 transferred by WSS to TWM was used to pay off part of TWM's obligation to United.Those loans were personally guaranteed by petitioners and, if United had demanded repayment of TWM's obligation, petitioners may have been required to answer for part of that obligation. Although TWM was not in default on the obligation, the payment of $240,000 of the then outstanding obligation of $320,000 owed United resulted in the removal of $240,000 of potential recourse against petitioners' personal assets. We think this constitutes a sufficient direct benefit to petitioners. See Cox v. Commissioner,56 T.C. 1270 (1971). The fact that subsequent loans by United to TWM resulted in petitioners being secondarily liable for amounts greater than that guaranteed in 1973 is of little importance. In view of petitioners' enhanced investment in TWM, the subsequent relief of personal liability on TWM's obligation to United, and the use of WSS funds to promote TWM without personal risk to petitioners' assets, we hold that the transfer of $420,000 from WSS to TWM primarily and directly benefited petitioners *51 and therefore constitutes a constructive dividend. Decision will be entered for the respondent.
Footnotes
*. taxable income before net operating loss deduction.↩
*. Taxable income before net operations loss deduction.↩
*. 4/01/74 through 9/30/76 ** 10/01/76 through 5/31/77 *** accrued 12/31/77↩