GEORGE J. HANHAUSER and MARJORIE M. HANHAUSER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
HANHAUSER v. COMMISSIONER
Docket No. 6930-73.
United States Tax Court
T.C. Memo 1978-504; 1978 Tax Ct. Memo LEXIS 13; 37 T.C.M. (CCH) 1851-67; December 20, 1978, Filed Francis J. Wormuth, for the petitioners. Paul J. Sude, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined a deficiency of $23,970.70 in petitioners' Federal income tax for the calendar year 1966 and an addition to tax under section 6653(b) [1] in the amount of $12,177.35. In an amended answer, respondent asserted an increased deficiency in income tax in the amount of $2,430.46 and an increase in the addition to tax under section 6653(b) in the amount of $1,215.23. *14 The parties have presented the following issues for our decision: 1. Whether petitioners failed to report taxable income in 1966 consisting of payments allegedly made for petitioner George J. Hanhauser's benefit, by companies and individuals doing business with corporations he controlled; and 2. Whether, if petitioners did understate their taxable income for 1966, any part of such understatement was due to fraud. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners George J. Hanhauser and Marjorie M. Hanhauser (Marjorie) were husband and wife and resided in Carbondale, Pennsylvania at the time their petition was filed in this case. They timely filed a joint Federal income tax return on a cash basis for the calendar year 1966 with the Internal Revenue Service Center at Philadelphia. [2]
*15 During the year 1966, petitioner and Marjorie each owned 50 percent of the issued and outstanding stock of Fab Weld Corporation (Fab-Weld), a corporation whose principal place of business was located in or near Simpson, Pennsylvania. Fab-Weld was engaged in the steel fabrication business, and employed in excess of 300 people in 1966. It manufactured material handling equipment, small equipment, cargo containers, and chassis for the containers. Petitioner was president of Fab-Weld and primarily responsible for its management. Marjorie was also active in the business in 1966, serving as the corporate vice president and secretary, in addition to working in the bookkeeping department. The books and records of the corporation were maintained in the offices at the Simpson facility. Fab-Weld was the subject of a proceeding in bankruptcy at sometime subsequent to the year in issue. In 1965, petitioner became involved with Alice D. Kinnett (hereinafter sometimes Polly). At that time, Polly resided near Philadelphia. Later that year she moved to Ledgerdale, Pennsylvania, where she had obtained part-time employment, in order to be closer to the petitioner. Marjorie Hanhauser was *16 unaware of the existence of this relationship. Far-View Enterprises, Inc.
Far-View Enterprises, Inc. (Far-View) is a Pennsylvania corporation organized on or about May 16, 1966. All of the shares of stock in Far-View were issued in the name of Alice D. Kinnett, who became the president of Far-View upon its incorporation. The shares of stock issued to Polly contained no restrictions with respect to her ownership of them. Petitioner was a director and treasurer of Far-View in 1966, but was never an employee of nor agent for Far-View. The articles of incorporation for Far-View were drawn up by Ernest D. Preate, a Scranton, Pennsylvania attorney. Petitioner had approached Preate for the purpose of forming Far-View, ostensibly on behalf of a friend (Polly), sometime in late March or early April of 1966. Preate had performed legal services for petitioner on numerous previous occasions, since approximately 1956, advising petitioner in connection with his business dealings and had incorporated several corporations for him. Far-View's stated purposes included engaging in the business of operating and improving farms and agricultural lands, raising and improving of livestock, *17 and the conduct and operation of recreation and resort areas. Most of the information required by Preate in order to incorporate Far-View was supplied by petitioner rather than by Polly, who was to become its sole shareholder. [3] In discussing the formation of Far-View with Preate, petitioner did not disclose or divulge the nature of or source of income which the corporation would be receiving. On June 1, 1966, Far-View purchased a 145 acre farm in Ararat, Pennsylvania, which is located northeast of Scranton. The total purchase price for the farm and its improvements was $18,550, allocated as follows: $17,000 for the real property and $1,550 for personal property. The terms of payment, established by negotiations preceding the agreement of sale, consisted of a down payment of $1,000 with settlement on June 1, 1966. The settlement involved a number of transfers by Preate. First, Preate transferred two checks totaling $11,580 to the seller. Each of these checks was payable to Far-View, one from Metropolitan Industries, Inc. in the amount of $10,000, the other from Del Penn *18 Steel Sales Corporation in the amount of $1,580. Second, on or about June 1, 1966, Preate transferred funds to satisfy a mortgage on the property in the amount of $4,559.64. Finally, Preate transferred cash to the vendor for the remainder of the purchase price. In order to make the settlement on the farm, petitioner arranged for a loan to Far-View in the amount of $10,000. The lender was Metropolitan Industries, Inc., a Pennsylvania corporation which was not an institutional lender. The loan was secured by a mortgage on the farm in favor of Metropolitan, and the security instrument was executed by Polly. Polly took up residence at the farm after its acquisition by Far-View, and she was generally responsible for its day-to-day operation. Petitioner derived a personal benefit in having the farm in close proximity to him, as he was able to able meet Polly for lunch or dinner and it facilitated his continuing relationship with her. After the formation of Far-View, Polly opened a corporate checking account at the Marine Midland Trust Company in Binghamton, New York. Binghamton is located approximately 45 miles from petitioner's residence in Crystal Lake, Pennsylvania, and *19 from the location of the Fab-Weld plant facility in Simpson. Both Polly and the petitioner were listed as authorized signatories for the corporate account, although petitioner rarely signed any checks drawn on that corporate account. [4] Immediately after the opening of the Marine Midland account, and through October 1966, the bank statements were mailed to the office of attorney Preate in Scranton. Thereafter, statements were mailed to the farm. Far-View also maintained investment accounts with at least two brokerage houses, houses at which petitioner had individual accounts. The Far-View accounts were opened at petitioner's suggestion, and petitioner advised Polly regarding Far-View's investment decisions. Polly engaged the services of an accountant, William McDonnell, to prepare the corporate income tax returns of Far-View. McDonnell's first meeting with Polly was in the late summer or fall of 1966 and was arranged by petitioner. *20 He prepared the Far-View returns for at least 4 years, beginning with the fiscal year ending May 31, 1967. McDonnell was not employed by Far-View to prepare any financial records, although he did instruct Polly regarding the kinds of elementary books and records she should keep for Far-View. The financial information supplied to McDonnell for his preparation of the tax returns consisted of a record of bank deposits and cancelled checks, supplemented by some explanation by Polly of the expenses for which the checks were written. In the fall of 1969, Polly left the farm to marry a farm-hand named Barrows. A meeting was than called by petitioner, in his capacity as an officer of Far-View, to consider the removal of Polly as president and a director of Far-View. This meeting was held in the office of the attorney Preate, and was attended by Preate, McDonnell, and petitioner. Francis Foote, petitioner's insurance broker over a period of years also attended the meeting and was elected president of Far-View, to succeed Polly. The other significant action taken at this meeting was the decision to close the corporate checking account at the Marine Midland Trust Company in Binghamton. *21 This account was closed because it was thought undesirable to allow a former officer the authority to write checks on the corporate account. A new corporate account was opened in a Peckville, Pennsylvania bank, with petitioner and Foote being granted authority to write checks on the new account. Polly was reinstated as an officer and director of Far-View shortly after her removal from those positions. Her reinstatement followed the failure of her brief marriage to Barrows. Payments to Far-View by Fab-Weld Suppliers
Fab-Weld experienced a dramatic upturn in its business prospects during 1966. This increase was the consequence of Fab-Weld having been awarded a substantial contract by the United States Department of Defense to manufacture Conex containers. Fab-Weld reported gross sales on its 1966 calendar year Federal income tax return in the amount of $5,971,902.58, and its cost of goods sold at $5,443,156.18. Its retained earnings and profits as of the beginning and the end of calendar year 1966 were $313,611.81 and $375,583.46, respectively. During the year in issue, Fab-Weld had numerous suppliers of raw materials and other products necessary for production. *22 Among the suppliers was Eastco Industrial Finishes Corporation (Eastco), which supplied paint "made" to Fab-Weld specifications. Steel suppliers included Del Penn Steel Sales Corporation (Del Penn) and J & G Enterprises, Inc. (J & G). Del Penn and J. & G obtained their line of merchandise by purchasing in the secondary steel market. Paint Suppliers
Eastco made the following monthly paint sales to Fab-Weld during 1966: Month
Sales
January $ 1,262.66
February
2,799.59
March
7,883.52
April
7,682.65
May
16,842.94
June
13,285.51
July
19,839.94
August
16,455.41
September
15,518.28
October
19,083.51
November
25,852.37
December
22,147.82
TOTAL
$ 168,654.20
Eastco sales to Fab-Weld during 1966 were attributable to its outside salesperson, John F. O'Connell, who was entitled to a commission on all Eastco sales to Fab-Weld. The rate of his commission varied with the particular item of merchandise purchased. The following table contains a monthly listing for the year 1966 of the commissions earned by O'Connell on sales to Fab-Weld, and the total commissions earned by O'Connell on sales to all customers: Month
Commissions (Fab-Weld)
Total Commissions
January $ 221.43
$ 1,108.01
February
635.50
1,258.54
March
1,673.85
2,875.42
April
1,622.97
2,999.96 May
3,562.42
4,508.90
June
653.93
1,764.66
July
1,025.73
1,296.15
August
827.47
1,886.85
September)
1,775.49
4,248.42
October)
November
1,075.51
1,790.14
December
1,129.86
2,071.78
Total
$ 14,204.16
$ 25,808.83
*23 O'Connell received payment from Eastco monthly for his commissions. During the first 5 months of 1966, O'Connell made payments to petitioner from the commissions that he earned on sales to Fab-Weld. The payments to petitioner were in the following amounts: Month
Amount
January $ 80.85
February
326.99
March
866.46
April
870.58
May
1,914.85
TOTAL
$ 4,059.73
During each of these 5 months, Eastco issued two checks payable to O'Connell. One of the checks was for the amount of the payment to be made to petitioner. These checks were cashed by O'Connell, with the cash then being transferred to the petitioner. The amounts so paid to petitioner were included in O'Connell's commissions earned, and consequently were included in his income. The second check issued each month to O'Connell was for the remaining portion of the total commissions he had earned for the month, as adjusted for various charges made to O'Connell's personal withdrawal account. Petitioner did not report the $4,059.73 which he received from O'Connell in 1966 on his 1966 Federal income tax return. Some portion of this money was used in the purchase of the farm by Far-View. The money *24 transferred to petitioner was not intended by O'Connell as a gift. O'CONNELL MADE NO ARRANGEMENTS WITH ANY OTHER CUSTOMER LIKE THOSE MADE WITH PETITIONER. Beginning with sales to Fab-Weld made in June 1966, O'Connell requested Eastco to make the payments directly to Far-View. The payments were made to Fab-Weld at petitioner's direction. The Eastco payments to Far-View began in August 1966.[5] They represented a portion of the commissions earned by 'Connell on sales to Fab-Weld, but were treated by Eastco and O'Connell as if the commissions on sales were being split between O'Connell and Far-View. One advantage of treating the payments to Far-View in this manner, according to O'Connell, was that the money paid to Far-View would not be included in O'Connell's gross income for income tax purposes. *25 The amounts of the payments to Far-View were based on the following-pre-existing commission rates for sales of Eastco products to Fab-Weld: Item
Rate
Olive drab paint $ .50/gallon
Eastco title
.50/unit
Regular paint
.30/gallon
Wash primer
.25/gallon
Since O'Connell usually retained $.15/gallon on sales to Fab-Weld as his commission, the amounts being paid to Far-View represented the greater portion of the commission to which O'Connell was entitled. The determination of the amounts paid to Far-View by the above rates was basically the same method by which the early 1966 payments to petitioner had been determined. Neither Far-View nor Polly provided any services, or supplied any other benefits, to either O'Connell or Eastco in consideration for these payments. As a result of O'Connell's request, Eastco established an account payable entitled "outside commission--Far View Enterprise", and made the following payments to Far-View during the last 5 months of 1966: Date of Payment
Amount
August 4
$ 2,704.50
August 30
3,009.20
October 4
1,313.75
October 20
3,652.00
November 8
2,885.75
December 2
4,198.00
Total
$ 17,763.20
*26 Steel Suppliers
Del Penn and J & G made sales of steel products to Fab-Weld totaling $131,962.09 and $18,018.20, [6] respectively, during 1966. These are the aggregate gross amounts listed on the purchase invoices for sales to Fab-Weld. Del Penn and J & G made payments to Far-View during 1966 by checks totaling $13,062.92 and $1,543.15, respectively, as follows: Date
Payor
Amount
May 11
Del Penn
$ 1,580.00
July 15
Del Penn
3,410.72
October 11
Del Penn
1,000.00
November 2
Del Penn
1,500.00
November 2
J & G
460.00
November 9
Del Penn
1,500.00
November 23
J & G
640.00
December 8
J & G
443.15
December 18
Del Penn
2,038.20
December 27
Del Penn
2,034.00
The payments to Far-View by Del Penn and J & G were made pursuant to the request of the petitioner. The money was transferred for the purpose of maintaining both Polly and the property owned by Far-View. The two steel suppliers accommodated petitioner's request in order to do business with Fab-Weld, and with the *27 expectation of increased business with Fab-Weld. Neither Far-View nor Polly provided any services, or supplied any other benefits, to the supplier in consideration for these payments. Petitioner made the arrangements for the payments to Far-View with Jay Slipakoff and Milton Alper. Slipakoff controlled the operations of Del Penn in 1966 and was responsible for making the arrangements for the Del Penn payments to Far-View. Alper was a salesman for Del Penn in 1966. He left Del Penn in the latter part of 1966 to organize his own steel brokerage business, J & G Enterprises, Inc. Alper was responsible for making the arrangements for the J & G payments to Far-View.
Scranton Galvanizing Company
Scranton Galvanizing Company (Galvanizing) was a Pennsylvania corporation organized during May of 1966. It was initially organized to perform galvanizing work for Fab-Weld on goods manufactured by Fab-Weld under a Government contract. Petitioner was the controlling shareholder and president of Galvanizing during 1966.Galvanizing had no accumulated or current earnings and profits as of the end of its fiscal year ending June 30, 1967. Petitioner was also the principal investor in *28 Galvanizing. His major investment or contribution was a structural steel craneway that he had purchased from John Baumann of Carbondale, Pennsylvania. The craneway was used by Galvanizing as the frame in the construction of a building for use as its plant facility located in Archbald, Pennsylvania. Galvanizing contracted with the Talarico Construction Company (Talarico) sometime during 1966 to construct the building around the craneway. The agreement between the two companies was an oral agreement entered into by petitioner and Silvio Talarico on behalf of their respective companies. Under the terms of the agreement, Galvanizing was to furnish the structural steel and some other materials, while Talarico was to furnish the labor and building materials that Galvanizing did not supply. Talarico was to be compensated on the basis of its costs (primarily labor) plus those materials that it supplied. The arrangement provided further that Talarico was to reimburse Galvanizing for certain steel used for the roof trusses which Galvanizing was to procure. The source for this reimbursement was certain bank construction loans received by Galvanizing, which funds were used to pay Talarico. *29 The estimate of the cost for the steel procured by Galvanizing was $10,000. On September 12, 1966, Talarico had nearly completed construction of the building, and the balance owed by Galvanizing on the building construction account was $40,852.60. At this time, petitioner presented a check to Talarico in the amount of $25,852.60 as a payment on the account. Although this payment left a lbance owed by Galvanizing in the amount of $15,000, petitioner requested reimbursement for the steel obtained by Galvanizing for the roof trusses in the amount of $10,262.35. Petitioner explained to Silvio Talarcio that the $262.35 by which his request for reimbursement exceeded the estimate of $10,000 was due to interest charges by the steel supplier. Silvio Talarico personally prepared a check, dated September 12, 1966, in the amount of $10,262.35 to accommodate petitioner's request for reimbursement. Pursuant to petitioner's instruction, the check was made payable to Metropolitan Industries, Inc. Talarico also added the notation - "For steel at Scr. Galy Job" -- at the top of the check to indicate that the purpose of the expenditure was the purchase of steel. Petitioner never supplied Talarico *30 with an invoice or a copy of an invoice for the purchase of the steel, although he did promise to do so. Metropolitan Industries, Inc. received the check in the amount of $10,262.35 on or about September 13, 1966. It then noted the satisfaction of the $10,000 note and mortgage owed it by Far-View. At the time the $10,000 note was satisfied, the interest accrued on the loan to Far-View amounted to $262.35. Talarico deducted the $10,262.35 payment to Metropolitan Industries, Inc. on his Federal income tax return for 1966. He claimed the $10,262.35 was a business expense for the cost of steel used in the construction of a building for Galvanizing. The deductibility of this expense was questioned by the revenue agent in a subsequent audit of that year's return because Talarico could not produce a receipt for the steel from Metropolitan. Thereafter, Talarico made a number of requests of the petitioner for an invoice or receipt for the steel. In August of 1968, petitioner responded to Talarico's requests by letter. In the letter, written on the stationery of Galvanizing, petitioner stated that the $10,262.35 was paid to Metropolitan Industries, Inc. to cover the purchase of *31 steel used in the construction of a building for Galvanizing. When questioned by the revenue agent about the matter, however, petitioner said that the $10,262.35 payment was made in connection with a loan between the two parties. The deduction claimed by Talarico for the steel was eventually disallowed by the revenue agent because of inadequate substantiation. As a consequence, Talarico's tax liability for 1966 was increased by over $3,000. After a demand by Talarico for reimbursement, petitioner made a cash payment to Talarico in the amount of the increase in taxes. Notice of Deficiency
In his notice of deficiency, respondent determined that petitioner received dividend income from Fab-Weld during 1966 in the amount of $33,899.27 which was not reported on his income tax return for that year. Of this amount, $32,369.27 is the amount of the payments by suppliers of Fab-Weld to Far-View during 1966. The remaining $1,560 is an unexplained 1966 deposit in the Far-View bank account which was treated by Far-View in a manner similar to its treatment of the payments by Fab-Weld suppliers, and determined by respondent to be a constructive dividend. In an amended answer, respondent *32 asserts that the $4,059.73 paid to petitioner by O'Connell during the first 5 months of 1966 was also includable in petitioner's income for that year. In addition, respondent determined that petitioner failed to include in his taxable income for 1966 the $10,262.35 payment by Talarico to Metropolitan Industries, Inc. for the purported purchases of steel used in the construction of the building for Scranton Galvanizing. Respondent also determined an addition to tax for fraud against the petitioner. OPINION We begin by focusing on the payments by Fab-Weld suppliers either directly to petitioner or to Far-View at his direction. These payments were made by Eastco, the paint supplier, and its salesman O'Connell, and by the steel suppliers, Del Penn and J & G. Respondent has relied for the most part on the theory that these payments constitute a constructive dividend to petitioner from Fab-Weld. Alternatively, he contends that the payments were subject to petitioner's economic control and provided a realizable economic value, bringing the payments within the broad sweep of gross income without regard to constructive dividend theory. We agree with respondent, even though he *33 has vacillated between legal theories throughout this case. [7] We have only the shareholders before us, Fab-Weld having gone bankrupt some time ago. If the receipts are viewed as a constructive dividend, (Cf. Ballentine Motor Co. v. Commissioner,39 T.C. 348, 355-356 (1962), aff'd 321 F.2d 796 (4th Cir. 1963)), the parties have stipulated that there are sufficient earnings and profits to characterized the entire amount as a dividend. Conversely, if the receipts are not taxable as a constructive dividend, they are nevertheless clearly encompassed within the broad sweep of gross income. It is well established that wrongful appropriations comprise taxable income whenever the person receiving them, as a practical matter, has such control over them that he derives readily realiable economic value. Burnet v. Wells,289 U.S. 670, 678 (1933); Corliss v. Bowers,281 U.S. 376, 378 (1930); Rutkin v. United States,343 U.S. 130 (1952); Weir v. Commissioner,283 F.2d 675 (6th Cir. 1960); Leaf v. Commissioner,33 T.C. 1093 (1960), affd. 295 F.2d 503 (6th Cir. 1961); *34 Benes v. Commissioner,42 T.C. 358 (1964), affd 355 F.2d 929 (6th Cir. 1966).Cf. James v. United States,366 U.S. 213, 217 (1961). [8]
Petitioner contends that the suppliers made payments to Far-View on their own initiative and were motivated by business advantages they expected Far-View to provide. Respondent contends that, because of his relationship with Polly, petitioner directed that the payments be made as a condition of doing business with his corporations. In resolving this dispute for respondent, we begin by focusing our attention on the nature and purpose of Far-View, the centerpiece of this litigation, and its relation to the principal characters involved. Far-View
Petitioner *35 was the moving force behind Far-View. In the spring of 1966, he consulted his attorney of longstanding, Mr. Preate, about forming Far-View. [9] Petitioner was a director and treasurer of the corporation and co-signatory on its checking account. He put up the initial money, paying off the Metropolitan loan with money belonging to Scranton Galvanizing. He provided at least some of the operating funds from payments he received in cash from O'Connell. It is true that Polly was the president and sole shareholder of Far-View. But petitioner was amorously involved with Polly at this time and she was an object of his favor. [10]
The theory that Far-View was intended to provide a substitute for hotel and restaurant facilities or a place *36 of business entertainment related to the business of Far-View and its suppliers is incredible. Alper denied that either he or Del Penn had any interest in Far-View. O'Connell made a perfunctory declaration of business interest in Far-View, apparently on the theory that this characterization of his payments was more complimentary than simply calling them a kickback.But he admitted he made virtually no use of Far-View, and in fact his payments during the first 5 months of 1966 were made in cash directly to petitioner. [11] Petitioner's theory was fabricated from whole cloth to meet the exigencies of the circumstances, and petitioner's entire testimony on this point was mendacious. *37 Far-View was simply a means for petitioner to provide for Polly. It was based on their ongoing relationship and nothing else. When Polly ran off and married the farmhand, petitioner promptly took definitive action, depriving her of access to the corporate bank account, removing her as president, and replacing her with his insurance agent, Mr. Foote. Following the failure of her brief marriage, she was reinstated as a director. These events clearly demonstrate both the real purpose of Far-View and the control petitioner exercised to achieve this purpose. Payments by Suppliers
An analysis of the payments by the suppliers confirms this view. During the first 5 months of 1966, O'Connell made cash payments directly to petitioner of over $4,000. Since these payments began in January, before the plan was conceived and implemented to organize Far-View, it is clear that the cash O'Connell transferred to petitioner was unrelated to Far-View. The cash was, however, directly related to the volume of Eastco's paint sales to Fab-Weld. The record clearly demonstrates that the payments were a part of O'Connell's commission, and, like the commissions, were made monthly. During *38 the first 5 months of 1966, O'Connell's commissions were divided into two checks; O'Connell cashed one of the checks, and transferred the cash to petitioner. The substance of these arrangements was simply that O'Connell was "splitting" his commissions on sales to Fab-Wld with petitioner--petitioner was using his control over Fab-Weld to procure a kickback based on the volume of business done. These payments were subject to petitioner's unfettered dominion and control to spend in any manner he desired. [12]
When Eastco began making payments to Far-View, it did not intend to deprive petitioner of his share of the commission on the continuing volume of business. The direct payment to Far-View of amounts previously handed to petitioner in cash clearly demonstrates that the payments to Far-View were petitioner's money being used for his benefit at his direction. It was of no concern to Eastco how petitioner took his cut or where the payments were made. The commissions were split or the kickbacks made both before and after August 1966 on essentially the *39 same basis--the volume of sales to Fab-Weld. The direct payment to Far-View served both petitioner's convenience and O'Connell's, since the latter no longer had to include the payments to or for petitioner in his income and pay taxes on it. There can be no doubt on this record that the payments to Far-View later in 1966 were, like the direct cash payments to petitioner earlier in the year, income to petitioner in the form of commission splitting or a kickback. We see no reason to view the payments to Far-View by the other suppliers differently. Petitioner does not dispute the existence of the payments to Far-View by the steel suppliers Del Penn and J & G of $13,062.92 and $1,543.15, respectively. In view of the nature and purpose of Far-View, these payments, like those by Eastco to Far-View, were made at petitioner's direction and on his behalf. They benefitted petitioner both economically and personally by financing Far-View and Polly in accordance with his wishes.[13]
*40 Payment by Talarico
Respondent also contends that the $10,262.35 payment by Talarico represented income to petitioner in the form of a kickback, rebate or commission. He argues that the substance of the payment was that petitioner received the payment directly from Talarico, and in turn made the payment in satisfaction of the mortgage of Far-View to Metropolitan Industries. Respondent submits that it is fairly concluded from the record that petitioner received the benefit of this payment by Talarico through false pretenses and it is taxable to petitioner under a claim of right theory. We are unable to accept the theory of taxability advanced by the respondent. The payment by Talarico was, in substance, the transfer by Talarico of $10,262.35 to Galvanizing for the steel involved followed by the payment of an obligation of Far-View at the direction of petitioner. The transfer by Talarico was merely an intercompany adjustment of open accounts reflecting various transactions between Galvanizing and Talarico. The payment was not a kickback, rebate or commission to petitioner and is not includable in his gross income on that basis. We believe the proper approach to the *41 taxability of the Talarico payment is as a corporate distribution. However, to the extent respondent has addressed the issue on brief, he has not argued that the payment represents a constructive dividend. [14] Indeed, the parties stipulated that Scranton Galvanizing did not have any accumulated earnings and profits or current earnings and profits as of the end of the fiscal year June 30, 1967. Fraud
The final issue for our determination is whether *42 any part of the underpayment of tax in 1966 was due to fraud within the meaning of section 6653(b). Section 6653(b) imposes a 50 percent addition to tax for each taxable year in which any part of the underpayment of tax is due to fraud. The existence of fraud is a question of fact which must be ascertained by an evaluation of all the facts of the case. Stone v. Commissioner,56 T.C. 213, 224, (1971); Stratton v. Commissioner,54 T.C. 255, 284 (1970). Respondent has the burden of proving the existence of fraud by clear and convincing evidence. Section 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Fox v. Commissioner,61 T.C. 704 (1974); Beaver v. Commissioner,55 T.C. 85, 92 (1970). To establish fraud, respondent must prove that petitioner acted with the specific intention of evading a tax believed to be owing. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Mitchell v. Commissioner,118 F.2d 308, 310 (5th Cir. 1941), revg. and remg. 40 B.T.A. 424 (1939), supp. opinion 45 B.T.A. 822 (1941); *43 Ross Glove Co. v. Commissioner,60 T.C. 569, 608 (1973). Fraud is never presumed or imputed; mere suspicion of fraud is not sufficient. Switzer v. Commissioner,20 T.C. 759, 765 (1953). The requisite intention may, however, be inferred from circumstantial evidence, such as proof of conduct calculated to mislead or conceal. Gajewski v. Commissioner,67 T.C. 181, 200 (1976), affd. 578 F. 2d 1383 (8th Cir. 1978); Beaver v. Commissioner,supra at 92-93; Pigman v. Commissioner,31 T.C. 356, 370 (1958). Respondent submits that the entire record herein is one of deliberate falsification, untruthfulness, and transparent explanations to cover up the reasons for filing a fraudulent income tax return for 1966. Petitioner, on the other hand, argues that the evidence is insufficient to prove that the underpayment was made with the intent to avoid taxes believed to be owing. Petitioner argues that the concealment of the payments to Far-View and the arrangements for making the payments were merely attempts to conceal his relationship with Polly, not an attempt to mislead the Internal Revenue *44 Service. More importantly, contends petitioner, he genuinely believed in 1966 that the organization and operation of Far-View did not result in tax evasion because he never realized that the arrangement could give rise to taxable income. On the basis of all the evidence, we conclude that respondent has proven by clear and convincing evidence that petitioner's underpayment of Federal income tax for 1966 was due to his filing fraudulent returns with intent to evade tax. Several factors lead us to this conclusion. We begin with the nature and purpose of Far-View, petitioner being the moving force behind the corporation. The record clearly demonstrates that Far-View was organized and operated to facilitate petitioner's relationship with Polly. This purpose was accomplished because Far-View served as the owner of the property (the farm), and superficially as a business entity to which "commission" payments could be made by Fab-Weld suppliers. These payments were simply the use of petitioner's funds to benefit Polly in accordance with petitioner's wishes at the time. Petitioner received cash payments from O'Connell during the first 5 months of 1966, based on the volume of Fab-Weld *45 paint sales. These payments were clearly income to petitioner. Similarly, when the chose to direct payment of this cash from commission splitting or kickbacks to Far-View, it was clearly for his own personal reasons arising out of his relationship with Polly. The failure to report this income, as well as the comparable payments from the steel suppliers, was with the specific intent to evade the tax petitioner knew was due on these payments. [15]
Petitioner's actions and testimony were designed to conceal in several respects. His story that Far-View was intended as an entertainment facility--a substitute for hotels and restaurants needed by Fab-Weld and its suppliers--was completely fabricated. Clearly the cash payments from O'Connell in January of 1966 were not "entrusted" to petitioner for Far-View as he claims, and the later conversion of these cash payments to direct transfers to Far-View did not alter their basic nature and purpose. *46 We find these elaborate fabrications are themselves evidence of fraud.
The record is replete with other instances of conduct by petitioner calculated to mislead or conceal the amounts expended for his benefit. For example, petitioner failed to disclose the anticipated sources of Far-View income (the commissions) to Preate, the attorney who incorporated Far-View. Also, McDonnell, the accountant who prepared the tax returns for Far-View, was not informed of the source of funds deposited in Far-View bank accounts, even though the deposits were used by him to determine Far-View's gross income. In addition, Far-View maintained its bank accounts in a city some distance from the farm, an inconvenience, but one calculated to generate the least amount of suspicion. See Jackson v. Commissioner,380 F.2d 661, 663 (6th Cir. 1967), affg. a Memorandum Opinion of this Court. Another factor we consider relevant is a number of explanations offered by petitioner to explain the purpose of the transactions involved in this case, explanations which are seriously undermined by other evidence in the record. Petitioner testified that he obtained legal advice from his attorney, Preate, *47 with respect to the intended purposes to be served by Far-View and the nature of the payments which would be received by Far-View. He stated that Preate had told him that the entire arrangement was perfectly legitimate. Nevertheless, Preate testified that petitioner had never approached him at the time Far-View was formed for that kind of advice. Another example involves petitioner's version of the events that transpired at a cocktail party on May 11, 1966, commemorating the opening of the Del Penn warehouse facility in Philadelphia. Petitioner testified that the conception of the idea to establish Far-View came from the steel suppliers Alper and Slipakoff at that party. He also suggested that Far-View was formed to accommodate the personal pleasures of the suppliers. However, the record is clear that petitioner had approached his attorney Preate to incorporate Far-View at a date prior to the cocktail party. [16]
*48 Another example is the series of explanations by petitioner regarding the $10,262.35 payment by Talarico to Metropolitan Industries. Petitioner insisted that Talarico issue a check in the amount of $10,262.35 to Metropolitan. He told Talarico that this was to pay for steel used in the construction job for Galvanizing. Yet during the trial petitioner testified that he never told Talarico this payment was for the purchase of steel, stating rather that it was issued to resolve an alleged dispute over whether Talarico had overcharged Galvanizing. Nevertheless, petitioner told the revenue agent, who audited Talarico's income tax return containing the deduction for the $10,262.35 payment, that the payment was connected with a loan transaction between petitioner and Talarico. Petitioner later recanted and wrote a letter to Talarico advising Talarico that the payment to Metropolitan represented the costs incurred in purchasing steel. There is no rational explanation for petitioner's subsequent transfer of $3,300 in cash to Talarico, other than to repay Talarico for the income tax liability occasioned by petitioner's failure to provide the necessary documentation of the purchase. Such *49 inconsistent positions and statements taken by petitioner merely to suit the convenience of the moment are a factor to be considered when determining the existence of fraud. See Gatling v. Commissioner,286 F.2d 139 (4th Cir. 1961). [17]
A final factor which we consider important is our evaluation of petitioner's credibility as a witness. This evaluation *50 was based in part on our personal observation of him during the course of the trial. It is also based on certain aspects of his testimony we find evasive, unresponsive and inconsistent, some of which are detailed above. Far-View enabled petitioner to finance personal activities by diverting before tax dollars from Fab-Weld. We are convinced that petitioner knew what he was doing, and why. He structured the transactions with the suppliers in order to provide maximum protection against their inadvertent discovery by his spouse or by others involved in bookkeeping for Fab-Weld. Moreover, it is unthinkable that petitioner could reasonably believe that Far-View was a legitimate corporation with a bona fide business purpose, as he has maintained. Far-View existed to facilitate petitioner's relationship with Polly, not to entertain customers or suppliers of Fab-Weld. Petitioner was an able and experienced businessman who deliberately failed to report payments that were made directly to him in cash or paid to Far-View at his direction and for his benefit; and he certainly knew that these payments should have been included in his gross income. In light of the above, we conclude that *51 respondent has shown by clear and convincing evidence that all or part of petitioner's underpayment of tax in 1966 was due to fraud. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated.↩
2. Marjorie M. Hanhauser is a party to this proceeding solely because she filed joint returns with her husband. The parties agree that Marjorie M. Hanhauser is relieved of all liability for taxes, including interest and penalties, for the year in issue pursuant to sections 6013(e) and 6653(b). George J. Hanhauser will hereinafter be referred to as petitioner.↩
3. It appears, however, that it was Polly who formally employed Preate to incorporate Far-View.↩
4. Petitioner and Polly also shared at least one other checking account during 1966. This account was with the Continental Bank and Trust Company, in the names of George Hanhauser and Alice D. Kinnett, and listed a Philadelphia address.↩
5. There was a period of approximately 30 to 60-days between the date of a sale to Fab-Weld and the corresponding payment by Eastco to Far-View. This was attributable to the practice by Eastco of requiring payment by the purchaser prior to its payment of commissions to its outside salespersons. O'Connell's status in relation to Eastco was altered about the time he began to request the direct payments to Far-View. He was treated as an employee by Eastco during the first 5 months of 1966 for purposes of tax withholding, but not thereafter.↩
6. The stipulation contains the amount of $13,018.20 for J & G sales to Fab-Weld in 1966. The correct amount, computed by adding the invoice amounts is $18,018.20↩
7. In some instances proper characterization of the receipt is critical to determining the amount of tax due. See Gardner, The Tax Consequences of Shareholder Diversions in Close Corporations, 21 Tax L. Rev. 223↩ (1966). 8. If more specific characterization is required, the payments were simply bribes or kickbacks, clearly taxable to petitioner. 1 J. Mertens, The Law of Federal Income Taxation, Sec. 6A13, p. 78 (1974).↩
9. In his petition, petitioner states that "With respect to the activities of Far View Enterprises, Inc., petitioner George J. Hanhauser consulted with an attorney and with a certified public accountant." ↩
10. There is a dispute over whether Far-View or petitioner bought Polly a mink coat, petitioner arguing for the latter interpretation on reply brief. Either way, it is clear petitioner was, in a substantial way, her benefactor during this period.↩
11. On reply brief, petitioner argues that the cash payments were "only entrusted to petitioner with O'Connell intending such payments to go to Far-View." But the plan to organize Far View was not formulated until the spring of 1966, and the corporation was organized in May of 1966. While we flatly reject the notion that O'Connell had any interest in Far-View, it is clear that even the interest petitioner attributes to him could not have originated until well into the year, several months after the cash payments to petitioner began.↩
12. As noted earlier, the notion that O'Connell entrusted these payments to petitioner for Far-View is simply preposterous.↩
13. Petitioner suggests that all payments by the steel suppliers to Far-View were voluntary and were made for personal and business services rendered. This is simply without any basis in fact. There is no credible evidence in the record for such conclusions, and we simply do not believe the seltserving testimony of petitioner, and the nearly identical testimony of Polly. Petitioner was the moving force and controlling figure behind Far-View. It was conceived, created, and operated for personal purposes arising from his relationship with Polly. On the basis of the entire record, we conclude that any use of the Far-View facility by agents of the steel suppliers was at most very insubstantial. We also conclude that Far-View performed no services, provided no information, and effected no preferences in the payment of bills in consideration for the payments to it by Del Penn and J & G.↩
14. Respondent's handling of this issue is rather unusual to put it nicely. The deficiency notice simply stated the payment represented income to petitioner from the contractor (Talarico). The stipulation stated that respondent contends that the payment represents a constructive dividend to petitioner. Respondent's opening brief contains only a few sentences on the Talarico payment, concluding with the surprising argument that the payment was income because petitioner "received the benefits of this payment by Talarico through false pretense." Unfortunately, respondent declined in his reply brief to include any↩ argument setting forth and discussing the points of law involved and disputed questions of fact presented.
15. It may be true that petitioner was also↩ motivated by a desire to be discreet about his relationship with Polly. Nevertheless, that the specific intent to evade tax is accompanied by other motives does not make it less significant.
16. At the same time petitioner contends that the idea for Far-View originated with the suppliers at the May 11, 1966 cocktail party, he contends O'Connell's cash payments as early as January were "entrusted" to him for Far-View. Both these positions cannot be true. In reality, the idea for Far-View did not exist as early as January, and if it did it existed only in petitioner's mind.↩
17. For technical reasons explained earlier, we have not sustained that part of the deficiency based on the Talarico payment. Nevertheless, petitioner's consistently untruthful behavior regarding this payment is, on the record before us, one of many factors appropriately considered in deciding the fraud issue. Petitioner also implies that these acts and statements relating to the Talarico payment are irrelevant since the issue of fraud depends on the intent at the time the returns were filed and not at a later date, citing Semple v. Commissioner,↩ a Memorandum Opinion of this Court dated August 28, 1951. But such statements and actions are relevant as bearing upon the credibility of petitioner and the truth of the explanations of his conduct that he has offered bearing on his intent when he filed his return.